974 F.2d 270
 61 USLW 2236, 15 Employee Benefits Cas. 2585
 Harry J. DIDUCK, individually and as a participant in the
Local 95 Insurance Trust Fund and the Local 95 Pension Fund,
and on behalf of all other persons who are, will be, or have
at any time since January 1, 1980 been participants or
beneficiaries in the Funds, similarly situated,
Plaintiff-Appellant-Cross-Appellee,
v.
KASZYCKI & SONS CONTRACTORS, INC.; William Kaszycki; and
Trustees House Wreckers Union Local 95 Insurance
Trust Fund and House Wreckers Union
Local 95 Pension Fund,
Defendants-Appellees,
John Senyshyn; Trump-Equitable Fifth Avenue Company;
Donald J. Trump, doing business as The Trump Organization;
the Equitable Life Assurance Society of the United States;
Donald J. Trump, Defendants-Appellees-Cross-Appellants.
 Nos. 805, 806 and 807, Dockets 91-7618, 91-7642 and 91-7644.
 United States Court of Appeals,
Second Circuit.
 Argued Dec. 12, 1991.
Decided Aug. 31, 1992.
 
 Wendy E. Sloan, New York City (Burton H. Hall, Hall & Sloan, of counsel), for plaintiff-appellant-cross-appellee Harry J. Diduck.
 Robert Wang, New York City (Michael C. Simmons, Mait, Wang & Simmons, of counsel), for defendant-appellee-cross-appellant John Senyshyn.
 Jay Goldberg, Jay Goldberg, P.C., New York City (Milton S. Gould, Fran M. Jacobs, Shea & Gould, of counsel), for Trump defendants-appellees-cross-appellants.
 Arthur N. Lambert, New York City (Kenneth L. Aron, Lambert & Weiss, of counsel), for defendants-appellees Trustees House Wreckers Union Local 95 Ins. Trust Fund and House Wreckers Union Local 95 Pension Fund.
 Before: FEINBERG, NEWMAN and CARDAMONE, Circuit Judges.
 CARDAMONE, Circuit Judge:
 
 
 1
 This suit stems from the construction of Trump Towers at Fifth Avenue and 56th Street in Manhattan. This marble-sheathed building was built by Trump-Equitable Fifth Avenue Co. (Trump-Equitable), a partnership of Donald J. Trump and the Equitable Life Assurance Society of the United States. This case illustrates an immutable law with respect to falsehoods--as immutable as the one respecting gravity Sir Isaac Newton conceived upon seeing an apple fall from a tree: having first manufactured a falsehood, a person is forced to invent more to maintain it; yet, as here, in the end, time generally reveals what a falsehood hopes to hide.
 
 
 2
 This appeal from the United States District Court for the Southern District of New York (Stewart, J.) challenges: 1) a finding that a union official fraudulently breached fiduciary duties in violation of § 404 of the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1101 et seq., as amended (ERISA); 2) a holding that a non-fiduciary may be jointly and severally liable with a fiduciary for knowingly participating in a breach of fiduciary duties under ERISA; 3) a finding that defendants Trump-Equitable, the Trump Organization, Inc., Donald J. Trump, Donald J. Trump d/b/a The Trump Organization, and the Equitable Life Assurance Society of the United States (Trump defendants) knowingly participated in the union official's breach; 4) an award of $325,415.84 in damages; 5) a refusal to award liquidated or "double interest" damages under ERISA § 502(g)(2); 6) a holding that punitive damages were not available under ERISA § 409(a); 7) an award of prejudgment interest calculated pursuant to 26 U.S.C. § 6621 for a total award of $768,374.70; 8) a finding that plaintiff lacked standing to bring a derivative action under § 515 of ERISA for failure to satisfy the demand requirement of Fed.R.Civ.P. 23.1; 9) a dismissal of the funds' trustees as defendants; and 10) a holding that plaintiff's common law cause of action for fraud was preempted under ERISA § 514(a).
 
 FACTS
 
 3
 Trump-Equitable contracted in January 1980 with Kaszycki & Sons Contractors, Inc. (Kaszycki) to demolish the Bonwit Teller building that occupied the site of the planned Trump Tower complex in Manhattan. Kaszycki, responsible for providing labor, equipment and supplies, employed undocumented non-union workers recently arrived from Poland. These Polish workers were paid "off-the-books," with no records kept, no taxes withheld, and pay not in accordance with wage laws. See Donovan v. Kaszycki & Sons Contractors, Inc., 599 F.Supp. 860 (S.D.N.Y.1984). Shortly after the New York Times ran a story on the demolition on March 16, 1980, union workers from the House Wreckers Union Local 95 began working at the site. Though the Polish workers were told they would be discharged, some continued working for a few more months. The collective bargaining agreement between the union and Kaszycki ran from July 1, 1978 through June 30, 1981. It obligated Kaszycki to make contributions to Local 95's Insurance Trust Fund and Pension Fund at the rate of eight and ten percent, respectively, for total wages paid to workers covered by the agreement. Thus, contributions on behalf of the Polish workers working under the agreement were due the union funds.
 
 
 4
 Defendant John Senyshyn, as president of Local 95, was a trustee (with two other union officials and three employer representatives) of the Pension Fund and (with one other union official and two employer representatives) of the Insurance Trust Fund. He began work at the job site on March 24, 1980 and served as the union's shop steward for three weeks or until the middle of April. After working at another site briefly, he returned to the Trump job until its completion in August 1980. John Osijuk succeeded Senyshyn as shop steward. The shop steward is required to complete and file with the union weekly reports listing all workers, hours worked, and wages. The union ordinarily compares these reports with the weekly payroll reports submitted by the employer to determine whether the employer is making the fund contributions required under the labor contract. Neither Kaszycki's nor Senyshyn's (and later Osijuk's) reports revealed the presence of the Polish workers as employees at the demolition site. Consequently, contributions owing the funds for their work were not made.
 
 
 5
 Kaszycki began experiencing financial difficulties and was unable to make the contributions required by the agreement, prompting Local 95 to threaten work stoppages. It was on account of these economic difficulties that a default judgment was entered against Kaszycki in the first district court proceeding. As a result, the demolition job's finances were thereafter assumed by Thomas Macari, vice-president of Trump-Equitable and its manager in charge of the demolition. On May 9 a bank account was opened in the name of Kaszycki & Sons that required Macari's signature for any withdrawals and on all checks. The bank signature card (falsely) identified Macari as vice-president of Kaszycki. After May 9 Macari oversaw all payments regarding the demolition of Bonwit Teller and arranged for Trump-Equitable to make payments to the union funds when Local 95 threatened to shut down the job. Before authorizing these payments, Macari consulted Kaszycki's reports--none of which included the Polish workers--and authorized six payments totaling $68,000 to the funds.
 
 
 6
 Plaintiff Harry J. Diduck, representing participants in and/or beneficiaries of the funds, brought a class action in the Southern District of New York alleging that defendant Senyshyn breached his fiduciary duties in violation of § 404 of ERISA, 29 U.S.C. § 1104. Plaintiff's complaint subsequently was amended to include an allegation that the Trump defendants knowingly participated in, and therefore were jointly and severally liable for losses caused by, Senyshyn's breach. Diduck also asserted a derivative claim on behalf of the funds alleging the Trump defendants are liable as an "employer" for unpaid contributions under § 515 of ERISA, 29 U.S.C. § 1145.
 
 
 7
 The district court initially dismissed the breach of fiduciary duty claim as barred by the statute of limitations and dismissed the derivative action on the ground that as the funds' trustees had not breached their fiduciary duties, Diduck lacked standing. See No. 83 Civ. 6346 (CES) (S.D.N.Y. July 18, 1988). On appeal we reversed and remanded. Diduck v. Kaszycki & Sons Contractors, Inc., 874 F.2d 912 (2d Cir.1989) (Diduck I ).
 
 
 8
 When the matter came before it a second time, the trial court found Senyshyn breached his fiduciary duties to the funds by failing to seek contributions from the employer on behalf of the Polish workers and that this breach involved fraud or concealment and damaged the funds to the extent of the underpayment. It also determined that the Trump defendants (through Macari and Trump-Equitable) knowingly participated in the breach, and thus were jointly and severally liable for the losses sustained by the funds. The amount of contributions that should have been made on behalf of the Polish workers from January 1980 through June 1980 was determined to be $325,415.84. Prejudgment interest from April 1, 1980 was added to this total. Judgment was accordingly entered in favor of plaintiff Diduck in the amount of $768,374.70. Plaintiff's derivative action under § 515 was dismissed. The decisions of the district court from which the instant appeal and cross-appeal have been taken are reported at 737 F.Supp. 792 (S.D.N.Y.1990) and 774 F.Supp. 802 (S.D.N.Y.1991).
 
 DISCUSSION
 I Senyshyn's Liability
 
 9
 Because the liability of the Trump defendants hinges on that of Senyshyn, the first question we address is his liability, an issue raised in the cross-appeal. In Diduck I, we reversed the district court's statute of limitations dismissal of Diduck's breach of fiduciary duty claim, noting that where the breach of fiduciary duty involves fraud or concealment, an action is timely if brought within six years after the breach is discovered. 874 F.2d at 919. See 29 U.S.C. § 1113(a); Fink v. National Sav. & Trust Co., 772 F.2d 951, 956 (D.C.Cir.1985). As a trustee of the funds Senyshyn owed them a fiduciary duty. See 29 U.S.C. § 1002(21)(A); Schaefer v. Arkansas Medical Soc'y, 853 F.2d 1487, 1492 (8th Cir.1988). He clearly breached his fiduciary responsibility to
 
 
 10
 discharge his duties with respect to [the] plan solely in the interest of the participants and beneficiaries ... for the exclusive purpose of [ ] providing benefits to participants and their beneficiaries ... with the care, skill, prudence, and diligence under the circumstances ... that a prudent man ... would use ...
 
 
 11
 29 U.S.C. § 1104(a)(1)(A)(i), (a)(1)(B). In failing to inform the funds that the Polish workers were doing work covered under the collective bargaining agreement so that contributions owing them could properly be calculated, Senyshyn failed to "ensure that [the] plan receive[d] all funds to which it [was] entitled." Central States, Southeast & Southwest Areas Pension Fund v. Central Transp., Inc., 472 U.S. 559, 571, 105 S.Ct. 2833, 2841, 86 L.Ed.2d 447 (1985). The issue for statute of limitations purposes, a breach of Senyshyn's fiduciary duty having been established, thus becomes whether this breach involved fraud.
 
 Fraud
 
 12
 Senyshyn and the Trump defendants contend on their cross-appeal that Judge Stewart's conclusion that Senyshyn's breach of duty involved fraud was clearly erroneous. We review the record in a light most favorable to the prevailing party, giving it the benefit of all inferences that the evidence supports. See Aspen Skiing Co. v. Aspen Highlands Skiing Corp., 472 U.S. 585, 604, 105 S.Ct. 2847, 2858, 86 L.Ed.2d 467 (1985).
 
 
 13
 That Senyshyn breached a fiduciary duty owed the funds does not itself establish fraud. See Beck v. Manufacturers Hanover Trust Co., 820 F.2d 46, 50 (2d Cir.1987), cert. denied, 484 U.S. 1005, 108 S.Ct. 698, 98 L.Ed.2d 650 (1988). Thus, we must determine whether the elements of common law fraud were sufficiently established. These include 1) a material false representation or omission of an existing fact, 2) made with knowledge of its falsity, 3) with an intent to defraud, and 4) reasonable reliance, 5) that damages plaintiff. See Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970-71 (2d Cir.1987). We examine each of these elements in turn.
 
 1. False Representations
 
 14
 Senyshyn's shop steward reports contained material false representations because they failed to report the work done by the Polish workers. While Senyshyn may not have made an affirmative misrepresentation concerning contributions owing for the time prior to Local 95's presence at the work site or after his tenure as shop steward, his failure to inform the funds of their entitlement to such contributions is an actionable omission by virtue of his status as a fiduciary. See Central States, 472 U.S. at 572-73, 105 S.Ct. at 2841 (trustee must take steps to identify all plan participants and beneficiaries and has responsibility for assuring full and prompt collection of contributions).
 
 2. Knowledge
 
 15
 To hold a defendant liable for fraud it must be shown that he acted with "knowledge," that is, he either knew of the falsity of the representations or believed them to be false. Restatement (Second) of Torts § 526 (1965) (Restatement Torts). Although the element of "knowledge" is not demonstrated by a party's mere negligence, it is satisfied if defendant makes a representation with reckless disregard as to its truth. See Rolf v. Blyth, Eastman Dillon & Co., 570 F.2d 38, 45 (2d Cir.1978). While the fact that a representation is false does not itself support an inference of knowledge of falsity, the defendant's situation or "continuity of conduct" may. See United States v. Simon, 425 F.2d 796, 809 (2d Cir.1969), cert. denied, 397 U.S. 1006, 90 S.Ct. 1235, 25 L.Ed.2d 420 (1970).
 
 
 16
 In assessing whether the knowledge element of fraud was satisfied as to Senyshyn, it is helpful to consider his challenged conduct in three segments: his conduct as shop steward; his conduct during Osijuk's tenure as shop steward; and the period prior to Local 95's beginning work in March 1980.
 
 Senyshyn's Tenure as Shop Steward
 
 17
 There is ample evidence to support the district court's conclusion that Senyshyn at least lacked an "honest belief" in the truthfulness of the representations contained in his shop steward reports. It noted the "Polish workers were obvious not only in numbers but also in appearance," 774 F.Supp. at 808, and explicitly rejected as not credible Senyshyn's contention that he thought they were members of a sister union. We see no basis to set aside as clearly erroneous the district court's finding respecting credibility. Ample evidence supports its conclusion that Senyshyn submitted shop steward reports with a reckless disregard as to the truth or falsity of the representations contained in them--that the union was not entitled to any more contributions than indicated on the employer's weekly payroll reports--thus establishing the requisite knowledge during his tenure as shop steward.
 
 Osijuk's Tenure as Shop Steward
 
 18
 John Osijuk took over as shop steward in April 1980 and served in that capacity until the project was completed in August 1980. Osijuk also failed to list the Polish workers on his reports. Senyshyn cannot be held to have the requisite knowledge for fraud during Osijuk's term as shop steward unless Senyshyn knew of Osijuk's failure to file accurate reports so that it can be said Senyshyn knew the funds were not being informed as to all the contributions to which they were entitled. In light of the fact that he knowingly failed to list the Polish workers in his own shop steward reports, it is reasonable to infer, as the district court did, that Senyshyn knew Osijuk "followed [his] example." 774 F.Supp. at 806 n. 8.
 
 
 19
 Upon his return to the demolition job Senyshyn worked "in the very same areas as the Polish workers," 774 F.Supp. at 806 n. 7, so that he knew they were still present and doing work covered by the agreement and, in light of his status as president of Local 95, it can be inferred that he knew the funds were still not receiving (nor even requesting) contributions for the Polish workers. In fact, when Senyshyn himself requested fund contributions from Macari, his requests did not reflect the work done by the Polish workers.
 
 
 20
 Hence, Senyshyn's failure to ensure that the funds received all contributions to which they were entitled during Osijuk's tenure as shop steward was a breach of fiduciary duty that he fraudulently failed to fulfill because his inaction was in reckless disregard of a duty to act. See Rolf, 570 F.2d at 47 (recklessness satisfied where conduct is highly unreasonable, representing an extreme departure from the standards of ordinary care because the danger was so obvious that defendant must have been aware of it).
 
 Pre-March 1980
 
 21
 The finding that Senyshyn breached his fiduciary duty respecting fund contributions owed for work done by the Polish workers prior to Local 95's presence on the job may not be upheld. The labor contract between Kaszycki and the union was a standard agreement. The usual practice in the industry is to modify the agreement's effective dates to comport with the date the agreement is entered into. In this case, apparently due to an oversight, the agreement's effective dates were not altered, and Judge Stewart held that it could not be modified by extrinsic evidence contradicting its plain terms. This construction is not seriously contested on appeal. As a result, the collective bargaining agreement was given retroactive application to January 1980, with the effect that Kaszycki was obligated to make contributions to the funds for work done by the Polish workers prior to the time the union began work on the project.
 
 
 22
 Senyshyn's failure to enforce the labor agreement to its full retroactive extent itself amounts to a breach of fiduciary duty, but does not demonstrate fraud. See Santa Fe Indus., Inc. v. Green, 430 U.S. 462, 473-74, 97 S.Ct. 1292, 1301, 51 L.Ed.2d 480 (1977). There was no evidence that he ever examined the agreement and, in light of the fact that its retroactive nature was uncommon in the industry, there is no basis upon which to conclude that Senyshyn acted in reckless disregard of its terms. While he may have been negligent in failing to familiarize himself with those terms, this is far from fraud. See Barker v. Henderson, Franklin, Starnes & Holt, 797 F.2d 490, 496 (7th Cir.1986); Restatement Torts § 526 comment d. Nor is the fact that Senyshyn knew the Polish workers had been employed by Kaszycki since the inception of the job sufficient. Crucial is whether he had some reason to believe the funds were entitled to contributions for the work done by these workers during this time. The only basis for the district court's finding that he did was "by applying the terms of the" agreement. 774 F.Supp. at 812. But absent any proof that Senyshyn was at least reckless in not being aware of the collective bargaining agreement's effective date, the terms of the agreement do not constitute sufficient proof. We therefore find that Senyshyn's breach did not involve fraudulent conduct as to contributions owing for this period of time.
 
 3. Intent
 
 23
 Defendants assert there was no evidence that Senyshyn intended the funds to rely upon his misrepresentations/omissions, i.e., induced reliance. They make much of the fact that no motive to defraud was established. But motive is simply helpful in showing an intent to defraud; failure to demonstrate it is not fatal where the circumstances indicate conscious behavior by the defendant from which intent can be inferred. See Beck, 820 F.2d at 50; Simon, 425 F.2d at 809. See also Rolf, 570 F.2d at 47 (proof of intent often inferential).
 
 
 24
 An actor intends a result where there is substantial certainty that the result will follow from his actions. Restatement Torts § 531 comment c. One of the primary functions of shop steward reports is as a check on employer contributions. Thus, the very nature of these reports is such that it can be said with "substantial certainty" that they would be relied upon by the funds' trustees in determining whether contributions above and beyond those remitted by the employer were due. See id. Had Senyshyn informed the funds that more contributions were owing than reflected on Kaszycki's reports during his and Osijuk's tenures as shop steward, appropriate action likely would have followed. It may be inferred therefore he intended to defraud the funds and for them to rely on his misstatements and omissions.
 
 4. Reliance
 
 25
 The defendants' challenge to the finding that the funds relied upon the misrepresentations is grounded on the fact that knowledge of the Polish workers' presence was widespread; hence, the funds' trustees could and should have sought contributions on behalf of these workers despite their omission from the shop stewards' reports. See Diduck I, 874 F.2d at 917. Yet, merely because the trustees were put on notice that the reports were false does not mean they were not relied upon or that reliance was unjustified.
 
 
 26
 The reliance element of fraud is essentially causation in fact. See W. Prosser, The Law of Torts § 108, at 714 (4th ed. 1971). Thus, defendant's conduct need not have been the "exclusive inducing cause" of plaintiff's actions, but only an "essential or inducing cause." See Restatement Torts § 546. In this case, it could be said that part of the reason for the trustees' failure to seek contributions for the Polish workers was independent of Senyshyn's breach. Nonetheless, because shop steward reports are designed specifically as a check on contributions owed by an employer, it was not clearly erroneous for the district court to conclude that if Senyshyn's shop steward reports had been accurate (or if Osijuk's inaccurate reports had been brought to their attention) the trustees would have sought contributions on behalf of the Polish workers. Cf. Day v. Avery, 548 F.2d 1018, 1026 (D.C.Cir.1976) (per curiam) (where defendant occupies fiduciary position with respect to plaintiff, plaintiff may be justified in assuming correctness of representations), cert. denied, 431 U.S. 908, 97 S.Ct. 1706, 52 L.Ed.2d 394 (1977). Thus, Senyshyn's fraud was an essential cause shaping the trustees' conduct.
 
 
 27
 The trustees' reliance on the inaccurate shop steward reports also was justified. See Corva v. United Serv. Automobile Ass'n, 108 A.D.2d 631, 633, 485 N.Y.S.2d 264 (1st Dep't 1985) (one may justifiably rely on misrepresentation while being at fault in failing to inquire into its accuracy). Although a party may not justifiably rely on obviously false representations, Restatement Torts § 541, recovery is not barred merely because plaintiff was negligent in such reliance. See id. § 545A. Even though it was well-known that non-union workers were employed on the demolition, it was not sufficiently "obvious" that the funds were entitled to additional contributions so as to make reliance on the shop steward reports unjustified. See 37 AmJur.2d, Fraud & Deceit, § 254. See also Zabriskie v. Lewis, 507 F.2d 546, 552-53 (10th Cir.1974).
 
 
 28
 Defendants assert there is no evidence the trustees actually saw the reports, and thus could not have relied on them. The district court credited the testimony of Joe Dektarovich, the administrator of the Pension Fund, that he occasionally compared the shop steward reports with the employer's reports, and though his testimony was in some respects equivocal on this point, this was a matter for the district judge to resolve. See, e.g., Renz v. Beeman, 589 F.2d 735, 743 (2d Cir.1978), cert. denied, 444 U.S. 834, 100 S.Ct. 65, 62 L.Ed.2d 43 (1979). Further, there was overwhelming proof that the typical practice is to compare shop steward and employer reports. The minutes of the October 20, 1980 trustees' meeting indicate that "Mr. Tvert [accountant for the funds] will check the shop steward's report against the money contributed to see if there are any discrepancies." Taken together, this evidence adequately supports the finding that the trustees did in fact examine the shop steward reports and relied upon them.
 
 5. Damages
 
 29
 The last element in this cause of action is proof of a causal connection between the fraud perpetrated and the loss complained of. The same causal connection is required between a breach of fiduciary duty and the loss alleged. See, e.g., Whitfield v. Lindemann, 853 F.2d 1298, 1304 (5th Cir.1988), cert. denied, 490 U.S. 1089, 109 S.Ct. 2428, 104 L.Ed.2d 986 (1989); Brandt v. Grounds, 687 F.2d 895, 898 (7th Cir.1982). Thus, Senyshyn (and the Trump defendants) may not be held liable for contributions owing the funds unless, absent a fraudulent breach, the funds could have collected them. See Rosen v. Spanierman, 894 F.2d 28, 34 (2d Cir.1990) (plaintiff must be in worse position than if fraud had not been committed); Restatement (Second) of Trusts § 205 comment f (1959) (Restatement Trusts).
 
 
 30
 The essence of defendants' proposition on damages is that Kaszycki, the only entity required to make contributions, was unable to do so because it had no money. See Diduck I, 874 F.2d at 917. Thus, even if the reports had been accurate the trustees could not have collected contributions for work done by the Polish workers. It cannot therefore be said, the argument continues, that the loss (underpayment of contributions) was proximately caused by Senyshyn's fraud. Plaintiff responds by pointing out that the Trump defendants acceded to demands for fund contributions on six occasions, paying $68,000 to avert work stoppages. If, plaintiff continues, the trustees had known that contributions for the Polish workers were also owing demands would have been made accordingly (reliance or cause in fact), to which Trump-Equitable would have acquiesced (legal or proximate cause).
 
 
 31
 The district court noted that "[t]he [f]unds suffered damages due to the underpayment of contributions," 774 F.Supp. at 811, but did not address the causal connection between Senyshyn's fraud and the funds' losses. We think the trial court at most found what might be called a prima facie case of damages caused by the fraud. At that point, the defendants should have been afforded an opportunity to rebut this showing. This chance was not afforded them. After such rebuttal, the trier would have to decide whether the plaintiff had sustained his burden of proving an amount of damages caused by the fraud. That has not yet occurred.
 
 
 32
 Nothing in the trial court's opinion finds the funds were "worse off" as a result of Senyshyn's fraud. See Day, 548 F.2d at 1029. Without a contrary finding, we believe it speculative to say Trump-Equitable would have paid $325,000 in contributions merely because they paid $68,000. Speculative damages cannot support a cause of action for fraud. See, e.g., Naartex Consulting Corp. v. Watt, 722 F.2d 779, 793 n. 22 (D.C.Cir.1983). See also Oosterhuis v. Palmer, 137 F.2d 322, 326 (2d Cir.1943) (in action claiming settlement agreement induced by fraud, plaintiff's damages would be prima facie the difference between the amount of claim and amount paid in settlement, but defendant might show there was no possibility of collecting full amount; difference between sum plaintiff reasonably could expect to recover and amount paid measures plaintiff's recovery).
 
 II Liability of the Trump Defendants
 A. Liability of a Non-Fiduciary under ERISA
 
 33
 The Trump defendants believe it was error for the district court to impose liability against a non-fiduciary for breach of fiduciary duties under ERISA. They insist that because ERISA is a comprehensive and reticulated statute a court should be wary of reading into it remedies in addition to those expressly set forth. See Massachusetts Mutual Life Ins. Co. v. Russell, 473 U.S. 134, 146-48, 105 S.Ct. 3085, 3092-93, 87 L.Ed.2d 96 (1985). Under its plain terms ERISA actions for breach of fiduciary duties lie only against the fiduciary who breaches such a duty, § 409, a co-fiduciary who knowingly participates in or conceals an act or omission of another fiduciary, § 405, or, in actions by the Secretary of Labor, against a third person who knowingly participates in a breach of fiduciary responsibility, § 502(l )(1).
 
 
 34
 There is, defendants insist, therefore no right of action by a plan participant against third parties who knowingly participate in a breach of fiduciary duties. Some courts find this view of ERISA persuasive. See, e.g., Useden v. Acker, 947 F.2d 1563, 1580-81 (11th Cir.1991), petition for cert. filed (June 1, 1992); Nieto v. Eckler, 845 F.2d 868, 871 (9th Cir.1988). We and other circuits have taken a different tack, holding "parties who knowingly participate in fiduciary breaches may be liable under ERISA to the same extent as the fiduciaries," Lowen v. Tower Asset Management, Inc., 829 F.2d 1209, 1220 (2d Cir.1987). Accord, e.g., Whitfield, 853 F.2d at 1303; Brock v. Hendershott, 840 F.2d 339, 342 (6th Cir.1988); Thornton v. Evans, 692 F.2d 1064, 1078 (7th Cir.1982). See also Dardaganis v. Grace Capital, Inc., 889 F.2d 1237, 1242 (2d Cir.1989) (making clear that Lowen was not merely a case of piercing the corporate fiduciary's veil in order to impose liability on the individual defendants).
 
 
 35
 Nor do we think Lowen should be reconsidered in light of Congress' addition of § 502(l )(1), which explicitly allows the Secretary of Labor to assess penalties against any party knowingly participating in a breach of fiduciary duties, while at the same time rejecting an amendment overruling Nieto. The Conference Report on the 1989 Budget Reconciliation Act, Pub.L. No. 101-239 that added § 502(l )(1), states that "[i]t remains the intent of Congress that the courts use their power [to] fashion legal and equitable remedies that not only protect participants and beneficiaries but deter violations of the law as well." H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. 433, reprinted in 1989 U.S.Code Cong. & Admin.News 1906, 3018, 3036 (emphasis added). It is precisely this authority upon which courts previously had relied in allowing an action under ERISA against parties who knowingly participated in a breach of fiduciary duty--conduct actionable under the common law of trusts. See, e.g., Lowen, 829 F.2d at 1220.
 
 
 36
 The problem with the Trump defendants' argument is that Russell 's statements regarding the limited authority to fashion remedies is taken out of context. Giving the Supreme Court's limiting language broad application would defeat Congress' effort to shape relief based on trust law principles where appropriate. See, e.g., Dole v. Compton, 753 F.Supp. 563, 568 (E.D.Pa.1990) (post-Russell case allowing suit against non-fiduciary). We recently noted the limited scope of Russell, recognizing that ERISA's legislative history demonstrated "Congress wanted federal courts to fill any gaps in the statute by looking to traditional trust law principles." Chemung Canal Trust Co. v. Sovran Bank/Maryland, 939 F.2d 12, 16-18 (2d Cir.1991) (allowing right of contribution among fiduciaries despite lack of ERISA provision allowing such suit), cert. denied, --- U.S. ----, 112 S.Ct. 3014, 120 L.Ed.2d 887 (1992).
 
 
 37
 Thus, although no implied right of action exists under ERISA in favor of a participant against a non-fiduciary who knowingly participates in an ERISA-fiduciary's breach of duty, the question remains whether a federal common law right of action should be recognized. This requires a consideration of whether there is a need for interstitial lawmaking and, if so, whether recognizing such a right of action would be consistent with ERISA's scheme and further its purposes. See Jamail, Inc. v. Carpenters Dist. Council, 954 F.2d 299, 303-04 (5th Cir.1992); U.S. Steel Min. Co. v. District 17, United Mine Workers of America, 897 F.2d 149, 153 (4th Cir.1990).
 
 
 38
 Section 514(a) of ERISA broadly preempts state law causes of action that "relate to" an ERISA-regulated plan. See, e.g., Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 98, 103 S.Ct. 2890, 2900, 77 L.Ed.2d 490 (1983). One factor pointing in favor of preemption is the "expectation[ ] that a federal common law of rights and obligations under ERISA-regulated plans would develop." Pilot Life Ins. Co. v. Dedeaux, 481 U.S. 41, 56, 107 S.Ct. 1549, 1558, 95 L.Ed.2d 39 (1987). And, though Congress may preempt state law remedies without providing a corresponding remedy under federal law, see Cromwell v. Equicor-Equitable HCA Corp., 944 F.2d 1272, 1276 (6th Cir.1991) cert. dismissed, --- U.S. ----, 113 S.Ct. 2, 120 L.Ed.2d 931 (1992); Phillips v. Amoco Oil Co., 799 F.2d 1464, 1470 (11th Cir.1986), cert. denied, 481 U.S. 1016, 107 S.Ct. 1893, 95 L.Ed.2d 500 (1987), some courts have concluded that because preemption, in the final analysis, turns on congressional purpose, if suits against non-fiduciaries may not lie under ERISA, Congress could not have aimed to preempt such actions. See Capital Mercury Shirt Corp. v. Employers Reinsurance Corp., 749 F.Supp. 926, 933-34 (W.D.Ark.1990); Munoz v. Prudential Ins. Co. of America, 633 F.Supp. 564, 571 (D.Colo.1986); see also Perry v. P*I*E Nationwide, Inc., 872 F.2d 157, 162 (6th Cir.1989), cert. denied, 493 U.S. 1093, 110 S.Ct. 1166, 107 L.Ed.2d 1068 (1990); Coleman v. General Elec. Co., 643 F.Supp. 1229, 1233-34 (E.D.Tenn.1986), aff'd mem., 822 F.2d 59 (6th Cir.1987).
 
 
 39
 If an action against non-fiduciaries is not preempted, Congress' scheme of bringing uniformity to the area of employee benefit plans, see, e.g., Fort Halifax Packing Co., Inc. v. Coyne, 482 U.S. 1, 9, 107 S.Ct. 2211, 2216, 96 L.Ed.2d 1 (1987), would be undermined insofar as the conduct and liability of non-fiduciaries would be assessed by varying state laws, while the conduct and liability of the fiduciary whom the third party is claimed to have knowingly assisted in breaching a duty would be governed by federal law. See Foltz v. U.S. News & World Report Inc., 627 F.Supp. 1143, 1176 (D.D.C.1986). Yet, on the other hand, if the availability of equitable relief against non-fiduciaries under § 502(a)(3) is read to mean that the scope of ERISA preemption extends to non-fiduciary conduct, see Gibson v. Prudential Ins. Co. of America, 915 F.2d 414, 417-18 (9th Cir.1990), the compelling federal interest in ensuring that employee benefit plan participants and beneficiaries obtain the benefits to which they are entitled will be thwarted because a party responsible for interfering with that objective will not be liable in a damages action in state court, or in federal court either, absent the existence of a federal common law damages remedy. See H.R.Conf.Rep. No. 386, 101st Cong., 1st Sess. 432-33, reprinted in 1989 U.S.Code Cong. & Admin.News 3018, 3035-36; see also Warren v. Society Nat. Bank, 905 F.2d 975, 982 (6th Cir.1990), cert. denied, --- U.S. ----, 111 S.Ct. 2256, 114 L.Ed.2d 709 (1991).
 
 
 40
 Broadening rights provided in a statute under the guise of federal common law should only be undertaken with great caution and where it "will vindicate an important statutory policy." See Cummings by Techmeier v. Briggs & Stratton Retirement Plan, 797 F.2d 383, 390 (7th Cir.), cert. denied, 479 U.S. 1008, 107 S.Ct. 648, 93 L.Ed.2d 703 (1986). Principles of trust law are appropriately factored into ERISA to develop a federal common law of employee benefit plans where to do so is not inconsistent with the legislative scheme and where it furthers the remedial objectives of the statute. See Russell, 473 U.S. at 148, 105 S.Ct. at 3093 (Brennan, J., concurring). As the above discussion demonstrates, recognizing a federal common law right of action in favor of plan participants against non-fiduciaries furthers two goals of ERISA and avoids a conflict between them. Unlike the situation in Russell, the relief sought here is not inconsistent with ERISA's scheme or the common law of trusts, and furthers ERISA's important purposes. Accordingly, we hold that one who knowingly participates in an ERISA fiduciary's breach of duty is jointly and severally liable with the fiduciary for resulting damages under ERISA. We thus turn to the question of whether the Trump defendants were in fact knowing participants in Senyshyn's breach.
 
 B. Knowing Participation
 
 41
 The well-settled elements of a cause of action for participation in a breach of fiduciary duty are 1) breach by a fiduciary of a duty owed to plaintiff, 2) defendant's knowing participation in the breach, and 3) damages. See, e.g., S & K Sales Co. v. Nike, Inc., 816 F.2d 843, 847-48 (2d Cir.1987). The Trump defendants' liability under this theory turns on the conduct of Thomas Macari, who took "over the finances of the demolition job from Kaszycki." 774 F.Supp. at 809. When Local 95 threatened work stoppages, it was Macari who arranged for Trump-Equitable to make payments to the funds. The district court found that in making these payments Macari, as Trump-Equitable's agent, knowingly participated in Senyshyn's breach. See id. at 812-13.
 
 1. Intent
 
 42
 The Trump defendants first object to Judge Stewart's holding that no intent on their part had to be shown. This objection is unfounded. No intent to harm need be proven in connection with a knowing participation claim. See S & K Sales, 816 F.2d at 849; Thornton, 692 F.2d at 1082 n. 40. The Trump defendants respond that fraud (which requires intent) had to be demonstrated in order for suit to be maintained against Senyshyn, and that they too therefore may only be liable when intent is proven as to them. Their reliance on aider and abettor liability cases under the securities laws for this proposition is misplaced. In such cases, the primary violation itself requires an intent to defraud. See Ernst & Ernst v. Hochfelder, 425 U.S. 185, 197, 96 S.Ct. 1375, 1383, 47 L.Ed.2d 668 (1976). Because the primary violator must possess an intent to defraud, in order to hold one liable as an aider-abettor for substantially assisting that fraud he or she must also possess an intent to defraud. See DiLeo v. Ernst & Young, 901 F.2d 624, 628 (7th Cir.), cert. denied, --- U.S. ----, 111 S.Ct. 347, 112 L.Ed.2d 312 (1990); Edwards & Hanly v. Wells Fargo Securities Clearance Corp., 602 F.2d 478, 485 (2d Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980).
 
 
 43
 Here, in contrast, Senyshyn's liability does not turn on whether he intended to defraud the funds, but on whether his breach of fiduciary duty involved fraud so that the claim for breach of fiduciary duty is not time-barred. ERISA's statute of limitations provides that "in the case of fraud or concealment, such action [an action with respect to a fiduciary's breach] may be commenced not later than six years after the date of discovery of such breach." 29 U.S.C. § 1113. Thus, though the existence of fraud is relevant to when "the action" may be timely brought, "the action" itself is still one for breach of fiduciary duty.
 
 
 44
 Statutes of limitations are designed to effect repose, not to affect standards governing conduct. That Senyshyn's breach of duty involved fraud is relevant only to the question of when a diligent plaintiff could have brought suit-- i.e., discovered the breach. See Stone v. Williams, 970 F.2d 1043, 1048-49 (2d Cir.1992). Not until the breach was discovered could plaintiff have discovered the Trump defendants' knowing participation in it. That fraud had to be shown in order for suit against Senyshyn to be timely does not mean fraud had to be shown as to the Trump defendants. Cf. Foltz, 627 F.Supp. at 1155 (acts of concealment done by one co-conspirator serve to toll statute against other co-conspirator if done in furtherance of the conspiracy). See also Fink, 772 F.2d at 958 (claims against fiduciary not time-barred; allegations of co-fiduciaries liability similarly not time-barred). The Trump defendants' liability is not predicated on their knowing participation in the fraud; it is based rather on their knowing participation in the breach. See Thornton, 692 F.2d at 1082 (in action alleging non-fiduciary knowingly participated in fiduciary's breach, which involved fraud, requirements of Fed.R.Civ.P. 9(b) need not be satisfied because claim is predicated on ERISA, not fraud). Since the Trump defendants are not accused of fraud, no intent to harm on their part need be shown.
 
 2. Knowledge
 
 45
 The relevant "knowledge" for liability to attach for knowingly participating in a fiduciary's breach of duty is knowledge as to the primary violator's status as a fiduciary and knowledge that the primary's conduct contravenes a fiduciary duty. See Restatement Torts § 876(b).
 
 
 46
 Macari's deposition indicates he knew Senyshyn was president of Local 95. It is also plain that the trial judge who presided over this 16-day bench trial could properly infer and in this case did infer, in light of the entire record, that Macari knew Senyshyn was a trustee who owed a fiduciary obligation to the funds. The district judge found Macari knew Senyshyn's requests for contributions were based only on the wages of union workers, 774 F.Supp. at 812, and that the Polish workers were not included on Kaszycki's reports, which Macari examined "very carefully" before authorizing payments to the funds. Id. at 807 n. 11. In order for Macari to have had knowledge of Senyshyn's breach, plaintiff was required to show Macari knew the labor contract required contributions for covered work done by non-union workers.
 
 
 47
 The district court's conclusion that Macari was "on notice" of Senyshyn's breach was not clearly erroneous: Macari was "experienced in construction work," knew which unions were on the job, and knew that the non-union Polish workers were being paid under the table for work covered by the collective bargaining agreement. See 774 F.Supp. at 808, 812. In light of Macari's control over every financial aspect of the demolition work, he was in fact on notice that Senyshyn was not fulfilling his fiduciary responsibilities. At the very least he "should have known." See Fink, 772 F.2d at 962 (Scalia, J., concurring).
 
 
 48
 Whether such constructive knowledge is sufficient is the issue we analyze next. The Trump defendants contend that actual knowledge is required. We think constructive knowledge suffices. See Brock, 840 F.2d at 342 (defendant liable where he "knew or clearly should have known" that trustees' conduct amounted to prohibited self-dealing); Donovan v. Schmoutey, 592 F.Supp. 1361, 1396 (D.Nev.1984) (defendant need only have constructive knowledge that fiduciary's conduct is in breach of duty); Restatement Trusts § 326, comment b (one may be chargeable with notice either as to fiduciary's status as trustee or that trustee is committing a breach of trust).
 
 
 49
 A defendant who is on notice that conduct violates a fiduciary duty is chargeable with constructive knowledge of the breach if a reasonably diligent investigation would have revealed the breach. See Restatement Trusts § 297 comment a. See Whitney v. Citibank, 782 F.2d 1106, 1116 (2d Cir.1986) (once defendant on notice of questions concerning partners' authority to bind partnership without plaintiff's consent, it owed duty to reveal facts to plaintiff and determine whether partners authorized to act.). See also 76 AmJur.2d, Trusts § 373 (1992) (persons knowingly dealing with trustees are under a duty of inquiry). In this case, as in Whitney, flying red flags were sending out signals that Senyshyn was violating his fiduciary responsibilities in not ensuring that the funds sought contributions on behalf of the Polish workers. Accordingly, Macari was on notice that Senyshyn was breaching his fiduciary duties; a reasonable investigation was therefore required. Although the extent of the duty of inquiry may not be the same in all circumstances, there is no doubt that here even a cursory investigation would have uncovered Senyshyn's breach. This imparts sufficient knowledge as to the Trump defendants. See, e.g., Brock, 840 F.2d at 342; see also American Republic Ins. Co. v. Union Fidelity Life Ins. Co., 470 F.2d 820, 826 (9th Cir.1972) (defendant knew of strong likelihood that fiduciary was breaching a duty, and was therefore required to check further).
 
 
 50
 This case is thus distinguishable from Terrydale Liquidating Trust v. Barnes, 611 F.Supp. 1006, 1027-31 (S.D.N.Y.1984), aff'd, 846 F.2d 845 (2d Cir.1988) (per curiam), in which the court (applying Missouri law) held that actual knowledge of the breach was required. Noting that the "nature of the wrongdoing alleged" on the part of the trustee was relevant in assessing the knowledge requirement, id. at 1030, the court refused to place a duty of inquiry on third parties who in an arms-length commercial transaction regular on its face purchased trust property which was sold in violation of a duty of loyalty and at a price found to be unfair to the trust. Unlike the situation in Terrydale, the breach by Senyshyn did not involve conduct "which may appear reasonable at the time [but] may later be shown upon closer inspection to be unreasonable." Id. In light of the nature of the breach in Terrydale and the transaction at issue, the court felt it inappropriate to impose a duty to undertake the type of inquiry which would have been necessary for the non-fiduciaries to assess the propriety of the trustees' conduct. The concerns motivating the Terrydale court are not implicated here.
 
 3. Participation
 
 51
 The district court found the Trump defendants "participated" in Senyshyn's breach by virtue of the contribution payments made by Trump-Equitable that it knew or should have known underrepresented the contributions to which the funds were entitled. See 774 F.Supp. at 812-13. Participation is not shown, defendants declare, merely by their failing to bring the fiduciary's breach to the attention of the trust beneficiaries. See, e.g., Painters of Philadelphia District Council No. 21 Welfare Fund v. Price Waterhouse, 879 F.2d 1146, 1153 n. 9 (3d Cir.1989). We take no exception to this statement of the law generally, but disagree with its applicability to the present facts.
 
 
 52
 One participates in a fiduciary's breach if he or she affirmatively assists, helps conceal, or by virtue of failing to act when required to do so enables it to proceed. See Newberger, Loeb & Co., Inc. v. Gross, 563 F.2d 1057, 1074 (2d Cir.1977), cert. denied, 434 U.S. 1035, 98 S.Ct. 769, 54 L.Ed.2d 782 (1978); Brock v. Gerace, 635 F.Supp. 563, 567 (D.N.J.1986) (act or omission which furthers or completes the breach). See also Halberstam v. Welch, 705 F.2d 472, 478 (D.C.Cir.1983) (advice or encouragement to act operates as moral support and has same effect on liability as participation or physical assistance). The third party need not profit from the breach and the assistance required is less than the "substantial assistance" necessary to impose aider-abettor liability under the securities laws. See Foltz, 627 F.Supp. at 1168.
 
 
 53
 Whether the aid rendered is "enough" to warrant the imposition of liability is essentially a proximate cause inquiry. See Edwards & Hanly v. Wells Fargo Securities Clearance Corp., 602 F.2d 478, 484 (2d Cir.1979), cert. denied, 444 U.S. 1045, 100 S.Ct. 734, 62 L.Ed.2d 731 (1980); Halberstam, 705 F.2d at 484. Thus, though but for causation is not sufficient, liability may attach for acts or omissions that are a "substantial factor in the sequence of responsible causation, and if the injury is reasonably foreseeable or anticipated as a natural consequence." Hecht v. Commerce Clearing House, Inc., 897 F.2d 21, 23-24 (2d Cir.1990).
 
 
 54
 In Whitney the participation found to have aided the breach was defendant's silence in the face of plaintiff's inquiries. See 782 F.2d at 1117. Here, Trump-Equitable's similar silence facilitated Senyshyn's breach. Once put on notice of the breach, Trump-Equitable could not continue its association with Senyshyn as if his conduct were not questionable. Its failure to inquire into the propriety of that conduct and take appropriate action was a substantial factor facilitating the breach. Making payments that Trump-Equitable knew or should have known "short-changed" the funds effectively ratified Senyshyn's conduct. See Rolf, 570 F.2d at 44. Where the primary wrong is a breach of fiduciary duty, the failure to comply with a duty to investigate while continuing to deal with the trustee may be a proximate cause of the breach. See American Republic, 470 F.2d at 826.
 
 III Calculation of Damages
 
 55
 The parties raise different objections, aside from the causation element discussed above, with respect to the damage award. In light of our dispositions concerning Senyshyn's fraud from January to March 1980 and the issue of causation, damages must be recalculated. We briefly discuss these contentions.A. Department of Labor Data
 
 
 56
 The district court utilized data gathered in a U.S. Department of Labor investigation stemming from Kaszycki's violation of the minimum wage and overtime compensation provisions of the Fair Labor Standards Act, 29 U.S.C. §§ 206(a), 207(a)(1), with respect to the Polish workers. In the course of its investigation the Department interviewed 26 and took the depositions of 29 of these workers. This information was used to determine the total number of manhours worked and was applied to the labor contract, in order to compute total wages due. Eighteen percent of the total was taken to represent the contributions due the funds.
 
 
 57
 We agree with the district court that since neither Kaszycki nor Trump-Equitable kept records regarding the Polish workers, the best and most reliable evidence was that compiled by the Department. 774 F.Supp. at 813. The reliability of the Department's data arises from its contemporaneous nature. It cannot seriously be contended that the time and expense occasioned by having each worker testify as to the hours he worked 12 years ago is justified. Defendants' assertions concerning the appropriate wage scale and whether damages were based on hours for work not covered by the collective bargaining agreement are without merit.
 
 B. Double Interest
 
 58
 Diduck objects to the district court's refusal to award "double interest" pursuant to § 502(g)(2) of ERISA. This section provides:
 
 
 59
 In any action ... by a fiduciary for or on behalf of a plan to enforce section 1145 ... in which a judgment in favor of the plan is awarded, the court shall award the plan--
 
 
 60
 (A) the unpaid contributions,
 
 
 61
 (B) interest on the unpaid contributions,
 
 
 62
 (C) an amount equal to the greater of--
 
 
 63
 (i) interest on the unpaid contributions, or
 
 
 64
 (ii) liquidated damages provided for under the plan in an amount not in excess of 20 percent (or such higher percentage as may be permitted under Federal or State law) of the [unpaid contributions] ...
 
 
 65
 29 U.S.C. § 1132(g)(2) (emphasis added). Thus, an award under this section encompasses, in addition to interest on the unpaid contributions, an amount equal to the greater of such interest (hence, "double interest") or the liquidated damages provided under the parties' agreement up to 20 percent of the amount of delinquent contributions. Interest is calculated at the rate provided in the parties' agreement or, if none is specified, pursuant to the adjusted prime rate. 29 U.S.C. § 1132(g)(2); O'Hare v. General Marine Transport Corp., 740 F.2d 160, 170 (2d Cir.1984), cert. denied, 469 U.S. 1212, 105 S.Ct. 1181, 84 L.Ed.2d 329 (1985).
 
 
 66
 By its terms, § 502(g)(2) is limited to suits to enforce contribution obligations owed by an employer to a multiemployer plan. See, e.g., Idaho Plumbers & Pipefitters Health and Welfare Fund v. United Mechanical Contractors, Inc., 875 F.2d 212, 215 (9th Cir.1989); Carpenters Amended & Restated Health Benefit Fund v. Ryan Constr. Co., Inc., 767 F.2d 1170, 1172 (5th Cir.1985). In contrast, the relief awarded Diduck was pursuant to § 409, which is limited to an award "to make good to [the] plan any losses to the plan resulting from ... [a fiduciary's ] breach ... and ... equitable or remedial relief as the court may deem appropriate." 29 U.S.C. § 1109 (emphasis added). Thus, § 502(g)(2) is not applicable to plaintiff's claims for breach of fiduciary duty. Nor do double interest and liquidated damages constitute "appropriate equitable relief" as recognized by the common law of trusts. To the contrary, double interest (as a form of liquidated damages) is a statutorily-created remedy designed to compensate the plan for the loss occasioned or costs incurred as the result of an employer's failure to make required contributions. See O'Hare, 740 F.2d at 171.C. Punitive Damages
 
 
 67
 Diduck also insists that punitive damages should be awarded, arguing that such damages are available under § 502(a)(2) (allowing for "appropriate relief" in suits brought pursuant to § 409). The Supreme Court has held § 409 does not provide for the recovery of punitive damages in suits brought by an individual beneficiary against a fiduciary. See Russell, 473 U.S. at 146, 105 S.Ct. at 3092. We have recognized that § 409 primarily is designed to undo harm resulting from a fiduciary's breach of duty rather than to penalize these breaches as such. See Donovan v. Bierwirth, 754 F.2d 1049, 1056 (2d Cir.1985).
 
 
 68
 Trustees generally are not subject to punitive damages at common law for a breach of fiduciary duty. See, e.g., Kleinhans v. Lisle Sav. Profit Sharing Trust, 810 F.2d 618, 627 (7th Cir.1987). The exception permitting recovery of punitive damages in cases of fraud or extreme disloyalty is just that--an exception--"occasionally awarded in a few states." Powell v. Chesapeake & Potomac Telephone Co. of Va., 780 F.2d 419, 424 (4th Cir.1985) (citing G. Bogert & G. Bogert, The Law of Trusts & Trustees, § 862 (2d ed. 1982)), cert. denied, 476 U.S. 1170, 106 S.Ct. 2892, 90 L.Ed.2d 980 (1986). See also Donnkenny Inc. v. Virginia Financial & Insurance Servs. Inc., 739 F.Supp. 290, 293-94 & n. 2 (W.D.Va.1990) (disallowing punitive damages even though conduct challenged in violation of fiduciary duty was fraudulent).
 
 
 69
 Our conclusion that punitive damages are not available under § 502(a)(2) is reinforced by the virtually unanimous interpretation of § 502(a)(3)'s similar language--"appropriate equitable relief"--as not allowing such recovery. See, e.g., Drinkwater v. Metropolitan Life Ins. Co., 846 F.2d 821, 825 (1st Cir.), cert. denied, 488 U.S. 909, 109 S.Ct. 261, 102 L.Ed.2d 249 (1988); Sokol v. Bernstein, 803 F.2d 532, 538 (9th Cir.1986). See also O'Neil v. Gencorp, Inc., 764 F.Supp. 833, 835 (S.D.N.Y.1991) (collecting cases). The similar language in these two statutory provisions of the same Act should be interpreted in the same way.
 
 D. Prejudgment Interest
 
 70
 As a general rule, a court has wide discretion under § 409(a), pursuant to its authority to award "appropriate relief," to award prejudgment interest. See, e.g., Dardaganis v. Grace Capital, Inc., 684 F.Supp. 1196, 1199 (S.D.N.Y.1988), aff'd in part, 889 F.2d 1237 (2d Cir.1989). Here prejudgment interest was awarded pursuant to 26 U.S.C. § 6621 at the adjusted prime rate set by the Secretary of the Treasury. Prejudgment interest is not intended to penalize the trustee but serves as compensation for the use of money withheld. See Lindeman, 853 F.2d at 1306. Hence, such an award must be made with an eye toward putting the plan in the position it would have occupied but for the breach. See Bierwirth, 754 F.2d at 1056.
 
 
 71
 Assessing the appropriate amount of interest requires a comparison of what the plan earned during the time in question and what it would have earned had the money lost due to the breach been available. One must look to the return on investments held by the plan to determine the appropriate interest rate to be applied under § 409. The burden is on defendant to demonstrate the plan would not have placed the money in the most profitable of equally plausible investment alternatives. See id.
 
 
 72
 In this case there was evidence that the funds' investments earned only from five to eight percent interest. Plaintiff introduced no evidence suggesting any other figure was appropriate, and the district court made no finding that the adjusted prime rate, generally accepted as a good indicator of the value of the use of money (which for the time in question was as high as 20 percent) fairly reflected the return the funds normally made on investments. Prime is not an appropriate measure where a plan typically does not earn that sort of a return on its investments. On remand, should the district court again decide to award prejudgment interest, it should briefly explain its reasons for adopting a particular rate as fairly representing the funds' normal return on investment.IV Diduck's Other Causes of Action
 
 A. Derivative Claim under § 1145
 
 73
 Plaintiff's second cause of action is a derivative claim for delinquent contributions under § 515 of ERISA against the Trump defendants as an "employer." The trial judge dismissed this claim for failure to satisfy the demand requirement of Fed.R.Civ.P. 23.1.
 
 
 74
 ERISA requires that employers make contracted-for contributions to a plan. See 29 U.S.C. § 1145. This obligation is enforced under § 502(g)(2), 29 U.S.C. § 1132(g)(2). A suit for unpaid contributions under § 502(g)(2) is brought "for or on behalf of a plan" and may only be maintained by an individual beneficiary derivatively. See Alfarone v. Bernie Wolff Constr. Corp., 788 F.2d 76, 80 (2d Cir.), cert. denied, 479 U.S. 915, 107 S.Ct. 316, 93 L.Ed.2d 289 (1986); Struble v. New Jersey Brewery Employees' Welfare Trust Fund, 732 F.2d 325, 338 (3d Cir.1984). Employer contributions inure to the benefit of the trust generally rather than an individual beneficiary and, as such, are an obligation the enforcement of which "is the function, at least in the first instance, of the Trustees." Struble, 732 F.2d at 337. Rule 23.1 is therefore applicable to derivative actions under § 502(g)(2). See McGinnis v. Transcon Lines, Inc., 1991 WL 60586 (N.D.Ill.) at *3.
 
 
 75
 Whether demand should have been excused as futile is fact specific and generally lies within the discretion of the district court. See Kaster v. Modification Systems, Inc., 731 F.2d 1014, 1018 (2d Cir.1984). Because the district court's refusal to excuse the demand requirement in this case was due to an erroneous interpretation of Diduck I, it was an abuse of its discretion not to allow plaintiff's action to proceed.
 
 
 76
 In Diduck I, we held the trustees breached their fiduciary duties in "failing even to investigate the possibility of suing Trump-Equitable" for contributions for the Polish workers. See 874 F.2d at 918. The district court relied on this language in concluding that since the trustees did not even consider pursuing legal remedies, it did not see how making a demand on them to sue the Trump defendants would have been futile. 737 F.Supp. at 801. This ignores our further observation that the trustees relied on shop steward reports when the evidence suggests they "knew--or, with reasonable investigation, could have discovered--that these reports were inaccurate." Diduck I, 874 F.2d at 917.
 
 
 77
 Our holding that the trustees breached their duty in failing to consider the possibility of action against the Trump defendants was based on the fact that their inaction was in the face of information suggesting action should be taken. This is therefore not a case of a failure to act due to lack of information, in which case it could not be said demand would be futile. Cf. Daily Income Fund, Inc. v. Fox, 464 U.S. 523, 546, 104 S.Ct. 831, 844, 78 L.Ed.2d 645 (1984) (Stevens, J., concurring) (demand should not be required where it would serve no useful purpose). Rather, this is a case of inaction in the face of information, rendering demand futile. Hence, plaintiff's action should have been allowed to proceed. In light of our holding that plaintiff's derivative claim was dismissed in error, the trustees do not object to being reinstated as nominal defendants. See Trustees' Brief at 16-17. The district court should therefore do so.
 
 B. Common Law Fraud
 
 78
 Diduck's third cause of action asserts a common law claim for fraud. Judge Stewart held this claim was preempted under § 514, which commands that ERISA "supersede any and all state laws insofar as they may now or hereafter relate to any employee benefit plan." 29 U.S.C. § 1144(a).
 
 
 79
 ERISA's preemption clause is "conspicuous for its breadth," FMC Corp. v. Holliday, 498 U.S. 52, ----, 111 S.Ct. 403, 407, 112 L.Ed.2d 356 (1990), representing Congress' aim to establish as an area of "exclusive federal concern" the regulation of employee benefit plans. Id. Consequently, the phrase "relate to" is to be interpreted broadly, Shaw, 463 U.S. at 98, 103 S.Ct. at 2900, encompassing common law causes of action that "purport[ ] to provide a remedy for the violation of a right expressly guaranteed by [ERISA]." Ingersoll-Rand Co. v. McClendon, 498 U.S. 133, ----, 111 S.Ct. 478, 486, 112 L.Ed.2d 474 (1990). Because one purpose of preemption is to create uniformity in the area of pension plan regulation, see Coyne, 482 U.S. at 9, 107 S.Ct. at 2216, it is irrelevant that the state action or obligation sought to be enforced is consistent with ERISA's objectives. See Mackey v. Lanier Collection Agency & Service, Inc., 486 U.S. 825, 829, 108 S.Ct. 2182, 2185, 100 L.Ed.2d 836 (1988). Diduck believes the fraud claims are run-of-the-mill state law claims and hence not preempted, noting that Mackey held that in order to give effect to ERISA's provision allowing plans to "sue and be sued," a state garnishment law of general applicability should not be preempted. See id. at 834, 108 S.Ct. at 2187-88.
 
 
 80
 Plaintiff's common law fraud claims are clearly distinguishable. Unlike Mackey, the claim here asserted has as a "critical factor in establishing liability" the existence of a plan and duties similar to those imposed by ERISA. See Ingersoll-Rand, 498 U.S. at ----, 111 S.Ct. at 483. See also Powell, 780 F.2d at 421 (state law claim which relates to plan preempted although based on general state law which itself has no impact on plan). The fraud alleged "relates to" an ERISA-regulated employee benefit plan because it concerns the conduct of a fiduciary and third parties in relation to the plan. The exclusive remedy for improper conduct in such cases is under § 502(a). See Ingersoll-Rand, 498 U.S. at ----, 111 S.Ct. at 485-86; Felton v. Unisource Corp., 940 F.2d 503, 510 (9th Cir.1991). A state common law action which merely amounts to an alternative theory of recovery for conduct actionable under ERISA is preempted. See, e.g., Aetna Life Ins. Co. v. Borges, 869 F.2d 142, 146 (2d Cir.), cert. denied, 493 U.S. 811, 110 S.Ct. 57, 107 L.Ed.2d 25 (1989); Powell, 780 F.2d at 422.
 
 CONCLUSION
 
 81
 The judgments appealed from are accordingly affirmed in part and reversed in part, and the case is remanded for further proceedings consistent with this opinion.
 
 
 82
 JON O. NEWMAN, Circuit Judge, concurring in part and dissenting in part:
 
 
 83
 A demolition company ("Kaszycki"), hired to work on a construction site, failed to make pension fund contributions for a group of "off-the-books" Polish workers. Unfortunately, Kaszycki became insolvent and could not pay the contributions when the failure to pay was discovered. Understandably, the funds sought to collect from deeper pockets. They found two--a trustee of the funds and the owner of the site. The District Court imposed liability on both--on the trustee, on the theory that he breached a fiduciary duty, and on the owner, on the theory that it participated in the fiduciary's breach. The majority properly declines to uphold such liability on the present record, but nonetheless remands for further proceedings at which such liability may again be imposed. Because I believe the record irrefutably establishes that neither the trustee nor the owner has any liability on these theories for the damages suffered by the funds, I respectfully dissent.
 
 
 84
 In its effort to maintain the viability of the plaintiff's claims that the trustee breached a fiduciary duty and that the owner participated in that breach, the majority makes three rulings with which I disagree. These concern the sufficiency of the evidence to permit a finding that (1) the funds' relied on the trustee's breach, (2) the trustee's breach caused damages to the funds, and (3) the owner knew of the trustee's status as a fiduciary.
 
 
 85
 1. The funds' reliance on the trustee's breach. The majority recognizes that a required element of plaintiff's claim is proof that the funds relied on Senyshyn's falsification of the shop steward reports. The District Court endeavored to find reliance from the testimony of the administrator of the funds, Joe Dektarovich. The majority charitably characterizes his testimony as "in some respects equivocal" but ultimately adequate to support a finding of reliance. In fact, Dektarovich's testimony conclusively establishes that the shop steward reports were not relied upon to determine fund contributions.
 
 
 86
 Dektarovich testified that he looked only at Kaszycki's payroll report to determine the amount of contributions owed (A 1365) and specifically stated that he did not look at the shop steward reports while the Kaszycki job was in progress (A 1366). Judge Stewart found reliance on the theory that the shop steward report "was used by the fund administrators as a cross-check on the employer's weekly payroll reports." (A 2287). For this statement, he cites to Tr. 1907. But on that page, Dektarovich says only that the fund requires shop steward reports so that a cross-check can be made; there is no testimony that he used them for that purpose during the Kaszycki job.
 
 
 87
 Possibly, a general practice of cross-checking might support a finding of reliance, but not in this case for two reasons. First, Dektarovich was specifically asked whether he remembered ever making a comparison of the shop steward reports for the Kaszycki job with the employer reports, and he replied, "I didn't." (A 1367). Second, the reports themselves show a name on the shop steward reports that does not appear on the payroll reports. The shop steward report for March 24 shows "P. Klapko, number 5398" (A 1761), who is not on the payroll report (A 1797). Whatever the general practice may have been, the evidence is clear that the shop steward reports were not relied on for contributions during the three weeks of the Kaszycki job during which Senyshyn submitted false reports.
 
 
 88
 2. Proof of damages caused by the fraud. Even if Senyshyn could be found liable for a fraudulent breach of a fiduciary duty, I disagree that the plaintiff has presented sufficient evidence to permit a finding that his breach caused the funds any damages. Senyshyn has no duty to pay the contributions out of his pocket simply because he is a trustee and is aware that the contractor is not paying. Even the plaintiff does not make such an extravagant claim. Instead, his theory of Senyshyn's liability for damages is that Senyshyn failed to inform the trustees of the correct amounts owed, that if he had done so, the trustees, armed with knowledge of those amounts, would have made demand on Trump, and that Trump would have paid those amounts. It is a wonderful theory. But there is no evidence to support all of its necessary steps, and the District Judge did not purport to make the requisite findings. The majority acknowledges that the District Judge has not found a causal connection between Senyshyn's fraud and the funds' losses. Nevertheless, the majority concludes that the plaintiff has presented what the majority calls "prima facie damages" and remands to afford the defendants an opportunity to rebut that showing, after which the trier will be permitted to find that the plaintiff has sustained his burden of proving an amount of damages caused by the fraud. In my view, the plaintiff has totally failed to prove that the fraud caused damages to the funds.
 
 
 89
 It is fundamental that proof of damages is part of a plaintiff's burden, including the burden to prove that the damages claimed to have been suffered were caused by the wrong claimed to have been committed. The law tilts somewhat generously in favor of wronged plaintiffs by casting upon them only a burden to prove the fact that the wrong caused damages and a reasonable basis for estimating the damages alleged to have been suffered; the risk of error in calculation is thereby placed on the wrongdoer. See Bigelow v. RKO Radio Pictures, Inc., 327 U.S. 251, 263-66, 66 S.Ct. 574, 579-80, 90 L.Ed. 652 (1946); Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 562-67, 51 S.Ct. 248, 250-52, 75 L.Ed. 544 (1931). In a few carefully defined circumstances, where the difficulty of determining the amount of damages has been created by the wrongdoer's conduct, the law is even more generous and places on a plaintiff only a burden to show that the wrong caused damages that are some undefined part of a larger sum, with the burden on the defendant to prove the portion of the larger sum that is not compensable damages. See, e.g., 5 William A. Fratcher, Scott on Trusts § 515, at 609 (4th ed. 1989) (burden-shifting rule applies to claim against trustee for commingling funds). But there is no basis for applying a similar burden-shifting rule to any of the defendants in this case. They did not merge proper gains with improper gains obtained at the plaintiff's expense. If liable at all, it is only because Senyshyn's conduct caused the funds not to receive contributions they would otherwise have received. But it was part of the plaintiff's case to prove the causal link between the conduct and the loss. The plaintiff did not prove an essential part of his causation theory--that the Trump defendants, having volunteered to pay $68,000 to avoid work stoppages, would have stepped up and paid an additional $325,415 if asked to do so. There is no finding that they would have done so, as the majority recognizes, and, in my view, the evidence, even without the rebuttal opportunity now afforded the defendants, would not permit such a finding.
 
 
 90
 3. The owner's knowledge of the trustee's status as a fiduciary. Even if there is liability on the part of Senyshyn and even if the evidence could support a finding that his fraud caused damages to the funds, I disagree that the Trump defendants may be held liable for participation in the trustee's breach. The majority recognizes that the knowledge necessary to hold the Trump defendants liable as participants in Senyshyn's breach of his fiduciary duties is "knowledge as to [Senyshyn's] status as a fiduciary and knowledge that [Senyshyn's] conduct contravenes a fiduciary duty." To show knowledge of Senyshyn's status as a fiduciary, the majority says: "Macari's deposition indicates he knew Senyshyn was president of Local 95. It is also plain that the trial judge who presided over this 16-day bench trial could properly infer and in this case did infer, in light of the entire record, that Macari knew Senyshyn was a trustee who owed a fiduciary obligation to the funds." I doubt that Judge Stewart made the inference that Macari knew that Senyshyn was a trustee. Clearly, he made no such finding explicitly. His sole finding as to Macari's knowledge of Senyshyn's roles is the following: "Macari knew that Senyshyn was the union president as well as the shop steward." 774 F.Supp. at 809.
 
 
 91
 In any event, I see no basis whatever for such an inference. Presidents of local unions are not necessarily trustees of pension funds. Sometimes they are, and sometimes they are not. Nothing in this record provided Macari with a basis for thinking that just because he knew that Senyshyn was the president of Local 95, he must also have known that Senyshyn was a trustee of the funds.[1] Thus, the exposure of the Trump defendants based on Macari's knowing participation in Senyshyn's breach of fiduciary duties rests on the unsupportable inference, attributed to the fact-finder by the majority of this Court, that Macari knew that Senyshyn was a trustee. I would therefore enter judgment for the Trump defendants at this point on the claim of aiding a breach of fiduciary duty for lack of any evidence that their agent Macari knew that Senyshyn was a trustee. At a minimum, the remand should oblige the District Judge, as fact-finder, to decide explicitly whether to draw the inference that Macari knew Senyshyn was a trustee and, if he makes such an inference, to set forth the facts supporting the inference so that we may review the reasonableness of drawing that inference.
 
 
 92
 4. The derivative claim against Trump as employer. I agree with the majority that the derivative claim against Trump as employer should be allowed to proceed because the failure to make demand on the funds was excusable as futile. But in returning this claim to the District Court, I caution that it is by no means certain that Trump can be found liable as an employer. This does not appear to be a case like NLRB v. Browning-Ferris Industries of Pa., Inc., 691 F.2d 1117 (3d Cir.1982), where the entity deemed to have become the employer set essential terms and conditions of employment. An owner faced with a job shut-down at his site must be free to advance funds to a defaulting contractor to meet the payroll without automatically thereby being deemed to have become an employer with full liability for all of the contractor's liabilities to the employees.
 
 
 93
 For all of these reasons, I respectfully dissent from the remand of the claims against Senyshyn for breach of fiduciary duty and against Trump for participation in that breach. I concur in all other aspects of the Court's judgment.
 
 
 
 [1]
 The majority attributes to Judge Stewart a finding that Macari had actual knowledge that Senyshyn was a trustee and does not rely on constructive knowledge of this crucial fact. I agree that constructive knowledge would not suffice, even if the facts supported it. The law of trusts goes far in imposing liability on third parties when they aid trustees in conduct that the third party knew or should have known was a breach of a fiduciary duty. See George G. Bogert & George T. Bogert, The Law of Trusts and Trustees § 901, at 259 (2d ed. 1982). But that principle refers to constructive knowledge of the breaching conduct, not constructive knowledge of the status of the trustee. It is one thing to say that a person who knows he is dealing with a trustee must exercise care and make reasonable inquiry, and can be liable for aiding a breach of trust, where he knows or should know that the trustee is acting in breach of a fiduciary duty. But it is entirely different to say to all third parties that they are under some duty of inquiry as to the status of all persons with whom they deal and will be held liable for aiding the fiduciary duty breaches of a trustee whenever they should have known that the person was a trustee. The treatise cited by the majority, 76 Am.Jur.2d, Trusts § 373, at 370 (1992), observes this distinction when it says that persons who knowingly deal with trustees are under a duty of inquiry as to the conduct of the trustees. See also Leake v. Watson, 58 Conn. 332, 352, 20 A. 343, 344, (1890)