Thomas S. KIRK

v.

LIBERTY MUTUAL INSURANCE CO.

No. 3:96CV1042 (AHN).

United States District Court,
D. Connecticut.

Jan. 22, 1998.

Thomas G. Moukawsher, Moukawsher & Walsh, Groton, CT, for plaintiff.

Conrad S. Kee, Robert A. Fischer, Jackson, Lewis, Schnitzler & Krupman, Stanford, CT, for defendant.

## RULING ON DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

NEVAS, District Judge.

The plaintiff, Thomas S. Kirk ("Kirk"), brings this action against the defendant, Liberty Mutual Insurance Company ("Liberty Mutual"), for violations of the Employee Retirement and Income Security Act of 1974, 29 U.S.C. §§ 1001—1381 ("ERISA").

Now pending before the court is Liberty Mutual's Motion for Summary Judgment. For the reasons stated below, this motion [doc. # 25] is GRANTED.

## STANDARD OF REVIEW

A motion for summary judgment may not be granted unless the court determines that there is no genuine issue of material fact to be tried and that the moving party is entitled to judgment as a matter of law. *See* Rule 56(c), Fed.R.Civ.P.; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The substantive law governing the case identifies those facts that are material on a motion for summary judgment. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. A court must grant summary judgment "if the pleadings, depositions, an-

swers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact ...." Rule 56(c); *see Miner v. City of Glens Falls*, 999 F.2d 655, 661 (2d Cir.1993) (citation omitted). A dispute regarding a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Aldrich v. Randolph Cent. Sch. Dist.*, 963 F.2d 520, 523 (2d Cir.) (internal quotation marks and citation omitted), *cert. denied*, 506 U.S. 965, 113 S.Ct. 440, 121 L.Ed.2d 359 (1992). The burden of showing that no genuine dispute about an issue of material fact exists rests on the party seeking summary judgment. *See Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970).

After discovery, if the party against whom summary judgment is sought "has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof," then summary judgment is appropriate. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). In assessing the record to determine whether a genuine dispute as to a material fact exists, the court is required to resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought. *See Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. Thus, "[o]nly when reasonable minds could not differ as to the import of the evidence is summary judgment proper." *Bryant v. Maffucci*, 923 F.2d 979, 982 (2d Cir.) (citation omitted), *cert. denied*, 502 U.S. 849, 112 S.Ct. 152, 116 L.Ed.2d 117 (1991).

## FACTS

In 1962, Liberty Mutual hired Kirk as an attorney in its Brooklyn legal office. (*See* Dep. Thomas Kirk [hereinafter "Kirk Dep."] at 48–49.) He was responsible for defending Liberty Mutual policyholders in products liability, medical malpractice, automobile and general public liability cases. (*See id.* at 55.) In 1987, he transferred from the Brooklyn office to an office in Lake Success, where he continued his litigation practice until he retired in April, 1991. (*See id.* at 68.)

From 1987 through 1991, Kirk reported to Donald Sheehan ("Sheehan"), the Resident Attorney in the Lake Success office. Sheehan reported to Paul Goldblum ("Goldblum"), the New York Division General Attorney, and Goldblum reported to John W. Allen ("Allen"), Vice President and General Attorney for Liberty Mutual. (*See* Kirk Dep. at 70; Decl. John W. Allen [hereinafter "Allen Decl."] ¶ 5.)

In November, 1989, Kirk sent a memo to Allen, asking him if there was any truth to the "ever-reoccurring rumor that Liberty [Mutual] is supposedly going to come up with a so-called 'Golden Handshake' program." (*See* Kirk Dep. Ex. 10.) Allen wrote back, "In a word—'No!' We don't even have the rumors up here. I've asked someone who would have to be in on it early." (*Id.*) Kirk had two subsequent discussions with Allen, one by telephone and the other in person, in which he asked if there was "anything new on the golden handshake?" (*See* Kirk Dep. at 96, 103–105, 107.) Each time, Allen told him that he knew nothing about a "golden handshake" program. (*See id.* at 96.)

On February 21, 1991, Kirk wrote to Sheehan, Goldblum and Allen and informed them that he would be retiring from Liberty Mutual in April, 1991. (*See id.* Ex. 8.) On April 9, 1991, despite Allen's repeated denials of Kirk's requests for an artificial salary increase which would substantially increase his pension and allow him to retire early,[1] Kirk retired from Liberty Mutual. (*See id.* Ex. 8.)

In late August/early September, 1991, Helen Sayles ("Sayles"), Liberty Mutual's Vice President and Manager of Human Resources, in conjunction with a company-wide effort to reduce expenses, asked Anthony Cirignano ("Cirignano"), Assistant Vice President and Manager of Benefits, to identify various opportunities for expense reduction in the benefits area. (*See* Dep. Anthony Cirignano [hereinafter "Cirignano Dep."] at 6, 13–15.) Cirignano informed Sayles that one option to consider was an early retirement incentive program. (*See id.* at 22–23.) In or about September, 1991, Sayles asked him to gather more information about this option, including design possibilities, costs and actuarial data. (*See id.* at 25–26.)

In late September/early October, 1991, after Cirignano had met with Buck Consultants, the actuaries for Liberty Mutual's retirement plan, he and Sayles met with Liberty Mutual's senior management to present the early retirement incentive proposal. (*See id.* at 34–35.) Then, in late October/early November, Cirignano and Sayles gave Liberty Mutual's President and CEO, Gary Countryman ("Countryman"), an overview of the early retirement incentive. (*See id.* at 37–38.) Countryman directed them to develop and refine the program, and, on November 12, 1991, they presented it to Liberty Mutual Board of Directors' Compensation Committee ("the Committee"). (*See id.* at 46–48; Decl. Anthony Cirignano [hereinafter "Cirignano Decl."] ¶ 2.) The Committee approved it. (*See* Cirignano Decl. Attach. 1.) On November 20, 1991, Countryman sent a letter to all Liberty Mutual employees announcing the inception of the Special Retirement Opportunity Program ("the Program"). (*See* Cirignano Decl. Attach. 2.)

The Program provided retirement benefits to qualifying employees who retired between November 1, 1991 and March 1, 1992. (*See id.* Attach. 1.) The Program also applied

---

1. In January, 1991, Kirk wrote to Allen and asked him to raise his salary from $99,950 to $136,150, the maximum salary available to an employee in his division, so that he could immediately retire and receive a yearly pension of $40,285, over $10,000 more than his pension would be at his current salary. (*See id.* Ex. 1.) Kirk claimed that this would result in substantial short term savings to Liberty Mutual. (*Id.*) Allen rejected this proposal, but told Kirk that he would consider the possibility of referring cases to Kirk after he retired. (*See id.* Ex. 12.) On March 4, 1991, Kirk wrote to Allen and request-ed that he forward Kirk's proposal for a salary increase to the administrators of Liberty Mutual's retirement plan so that, in Kirk's words, a "final decision [could be] made by the experts." (*See id.* Ex. 15.) He also asked Allen to endorse the proposal with his approval. (*Id.*) On March 19, 1991, Allen wrote Kirk and informed him that he could not endorse his request for a salary increase, but that he had arranged for some referrals for Kirk. (*See id.* Ex. 16.) Allen further informed him that he had the option of revoking his decision to retire. (*Id.*)

retroactively to qualifying employees whose retirement took effect November 1, 1991. (*Id.*)[2]

After his retirement, Kirk learned that Liberty Mutual had adopted the Program. (*See* Kirk Dep. at 126.) On January 22, 1992, he wrote a letter to Allen in which he stated that he believed that Liberty Mutual had been considering the Program when he retired. (*See id.* Ex. 17.) He requested that Liberty Mutual either pay him the enhanced benefits offered under the Program or rehire him for a short period of time so that he could qualify for such benefits. (*Id.*) On February 11, 1992, Allen denied this request. (*See id.* Ex. 18.)

Kirk subsequently wrote to Countryman and Cirignano and requested that he be paid benefits under the Program. (*See id.* Exs. 2, 21, 23.) On March 19, 1992, and again on July 24, 1992, Liberty Mutual reiterated its decision that Kirk did not qualify for benefits under the Program because he did not retire during the designated time period. (*See id.* Exs. 20 & 24.)

On July 7, 1996, Kirk commenced this suit against Liberty Mutual for violation of ERISA. Specifically, Kirk alleges that Liberty Mutual misled him by making him believe that no "golden handshake" was forthcoming, when, in fact, it was considering an early retirement incentive program. (*See* Compl. ¶ 5.) Based on these misrepresentations, Kirk retired seven months before he would have qualified for benefits under the Program. (*See id.* ¶ 7.) He alleges that Liberty Mutual, as a fiduciary managing an employee welfare benefit plan, violated its duties under 29 U.S.C. § 1104. (*See id.* ¶ 9.)

### DISCUSSION

In this motion for summary judgment, Liberty Mutual argues that Kirk's claim is time-barred under 29 U.S.C. § 1113(2); or, in the alternative, that, based on the undisputed facts, Liberty Mutual did not, as a matter of law, violate its fiduciary duties under ERISA. The court finds that Kirk's ERISA claim is time-barred and therefore does not address Liberty Mutual's second argument.

The statute of limitations for a breach of fiduciary duty claim under ERISA is provided for in 29 U.S.C. § 1113. Under this section:

> No action may be commenced ... after the earlier of: (1) six years after (A) the date of the last action which constituted a part of the breach or violation, or (B) in the case of an omission the latest date on which the fiduciary could have cured the breach or violation, or; (2) three years after the earliest date on which the plaintiff had actual knowledge of the breach or violation; except that in the case of fraud or concealment, such action may be commenced not later than six years after date of discovery of such breach or violation.

29 U.S.C.A. § 1113 (West Supp.1997). By "actual knowledge," the statute has been interpreted to mean that a plaintiff must have knowledge of all material facts necessary to understand that he or she has a claim for breach of fiduciary duty. *See Kurz v. Philadelphia Elec. Co.*, 96 F.3d 1544, 1551 (3d Cir.1996).

Liberty Mutual argues that Kirk had actual knowledge of the breach on January 22, 1992, when he wrote to Allen and requested benefits under the Program. At that time, according to Liberty Mutual, Kirk knew that the Program existed and that he was not eligible because he had retired earlier than the November 1st cutoff. He also knew that, in 1989, Allen told him that the rumors about a golden handshake program were not true. Thus, Liberty Mutual argues, Kirk's claim is time-barred under ERISA because he had actual knowledge of the alleged fiduciary breach four and one-half years prior to when he brought the suit.

■ Kirk does not contest Liberty Mutual's claim that, on or before January 22, 1992, he had knowledge of the Program and of the fact that he was not eligible for it. Rather, he argues that ERISA's six year statute of

---

2. At Liberty Mutual, retirement takes effect on the first day of every month. Thus, any employee who had submitted his or her retirement during October, 1991, provided that they had otherwise qualified, would have been eligible to participate in the program. (*See* Cirignano Decl. ¶ 4; Cirignano Decl. Attach. 1.)

limitations governs this action because he has alleged that Liberty Mutual engaged in fraud or concealment. *See* 29 U.S.C. § 1113(1) (stating, "in the case of fraud or concealment, such action may be commenced not later than six years after date of discovery of such breach or violation"). As the Second Circuit has held, regardless of whether a plaintiff had actual knowledge of a fiduciary's breach, ERISA's six year statute of limitations applies to breach of fiduciary duty claims which involve fraud or concealment. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 874 F.2d 912, 919 (2d Cir.1989).[3]

■ In order to warrant application of this six year statute of limitations, a plaintiff must allege facts sufficient to establish common law fraud. *See Losquadro v. FGH Realty Credit Corp.*, 959 F.Supp. 152, 157 (E.D.N.Y.1997). Accordingly, the plaintiff must establish (1) that a material false representation or omission of an existing fact was intentionally and knowingly made; (2) that he or she reasonably relied on the misrepresentation or omission; and (3) that he or she suffered damages as a result of the misrepresentation or omission. *See Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 276 (2d Cir.1992). "That [the defendant] breached a fiduciary duty owed the [plaintiff] does not itself establish fraud." *Diduck*, 974 F.2d at 275–76 (citation omitted). Rather, the plaintiff must satisfy the pleading requirements of Rule 9(b), Fed.R.Civ.P., *see J. Geils Band Employee Benefit Plan v. Smith Barney Shearson, Inc.*, 76 F.3d 1245, 1255 (1st Cir.1996), and, then, in response to a motion for summary judgment, must come forward with evidence establishing each element of common law fraud. *See Diduck*, 974 F.2d at 276. Here, Kirk has done neither of these.

■ Under Rule 9(b), "[i]n all averments of fraud or mistake, the circumstances constituting fraud or mistake shall be stated with particularity." Fed.R.Civ.P. 9(b). To comply with this rule, the plaintiff must "allege specifically when and where the misrepresentations took place, the content of those misrepresentations, and the identity of the person or persons making them." *Butala v. Agashiwala*, 916 F.Supp. 314, 321 (S.D.N.Y. 1996). In addition, the Complaint must "explain how the misrepresentations were fraudulent." *Id.* In other words, a plaintiff must "specifically plead those events which give rise to a strong inference that the defendant[] had an intent to defraud, knowledge of the falsity, or a reckless disregard for the truth." *Connecticut Nat. Bank v. Fluor Corp.*, 808 F.2d 957, 962 (2d Cir.1987) (citation and internal quotation marks omitted).

■ Kirk's complaint falls short of Rule 9(b)'s requirements. Paragraph five of the Complaint, which contains the substance of Kirk's allegations, states the following:

[T]he defendant knowingly or negligently misled the plaintiff ... by making affirmative material misrepresentations that caused the plaintiff to believe that no enhancement of employee benefits would be offered to employees or was being seriously considered by the defendant; [] by giving incomplete and untruthful responses to the plaintiff's inquiries about employee options and benefits in that, in response to the plaintiff's inquiries, the defendant failed to disclose that it had decided to offer enhanced benefits to employees or was seriously considering making such an offer; [and] by failing, on or before the effective date of the plaintiff's retirement, to correct, supplement or supersede prior representations made by the defendant that caused the plaintiff to believe that no enhancement of employee benefits would be offered to employees or was being seriously considered by the defendant when, as of the effective date of the plaintiff's

---

**3.** In *Martin v. Consultants & Administrators, Inc.*, 966 F.2d 1078 (7th Cir.1992), the Seventh Circuit held, contrary to prior precedent, that "genuine acts of concealment committed in the course of the underlying wrong" are governed by ERISA's six year statute of limitations. *See id.* at 1095. Thus, in addition to allegations that a defendant engaged in concealing acts subsequent to the breach of its fiduciary duty, allegations that a defendant engaged in self-concealing fraudulent acts in the course of breaching its fiduciary duty would be covered by § 1113(2)'s six year limitations period. However, in order to qualify for this fraud exception, "[t]here must be actual concealment—i.e., some trick of contrivance intended to exclude suspicion and prevent inquiry." *Martin*, 966 F.2d at 1095 (citation and internal quotation marks omitted).

retirement, the defendant had decided to offer such benefits to employees or was seriously considering making such an offer.

(Compl.¶ 5.) Kirk fails to allege that Liberty Mutual engaged in fraudulent activity. In addition, he fails to allege that Liberty Mutual made the alleged misrepresentations or omissions with the requisite knowledge and intent. *See Diduck*, 974 F.2d at 275–76. Lastly, he fails to allege that Liberty Mutual fraudulently concealed the alleged misrepresentations. *See J. Geils Band Benefit Plan*, 76 F.3d at 1255 (holding that the exception applies where the defendant has engaged in a course of conduct designed to conceal evidence of the underlying ERISA violation).

Kirk's allegations are more typical of a breach of fiduciary duty claim. The Complaint does not plead, as is required by Rule 9(b), the content of the misrepresentations, the identity of those making the misrepresentations, or the location where the misrepresentations took place. Furthermore, the Complaint fails to allege how the misrepresentations were fraudulent. Kirk cannot, by his opposition to the summary judgment motion, convert his original breach of fiduciary duty claim into a claim for fraud simply to satisfy the requirements of the fraudulent concealment exception to ERISA's statute of limitations. *See Losquadro*, 959 F.Supp. at 158 (holding that the plaintiffs failed to satisfy the requirements of the fraudulent concealment exception because they did not "identify the time, place and actor involved in the concealing conduct [or] . . . specify whether they [were] alleging that the fraud was self-concealing").

Nonetheless, even if Kirk's complaint had satisfied the pleading requirements of Rule 9(b), he has not come forward with sufficient evidence in response to Liberty Mutual's motion for summary judgment to justify application of the fraudulent concealment exception. First, Kirk has not presented evidence, other than Allen's statements, to show how Liberty Mutual defrauded Kirk. Second, according to the evidence in the record, Allen believed that his statements regarding rumors about an early retirement program were true. (*See* Allen Decl. ¶¶ 9–11; Kirk Dep. at 169–70.) Thus, he could not have knowingly or intentionally attempted to defraud Kirk. Lastly, the evidence in the record indicates that Allen's statements to Kirk were, in fact, true. According to an internal Liberty Mutual memorandum concerning downsizing (the only evidence submitted by *Kirk* in support of his claim that Liberty Mutual was seriously considering an early retirement plan), as of July, 1989, it was recommended that Liberty Mutual *not* consider an early retirement incentive because such a plan would not save money. The memorandum stated that, according to a prior study, "by the time a retiree's replacement had been promoted and transferred, the salary cost [would be] nearly the same as the retiree's salary." For this and other reasons, the memorandum recommended considering an early retirement program "only as a last resort."[4] (*See* Pl.'s Mem. Opp. Mot. Summ. J. Ex. B.) This evidence directly contradicts the allegations in Kirk's complaint, which state that, in response to Kirk's inquiries, Liberty Mutual failed to disclose that it was *seriously considering* an early retirement program.[5]

4. Instead, the memorandum recommended that Liberty Mutual eliminate redundant and unnecessary jobs; appraise each employee annually and base any salary increase on his or her past performance; and, "depending on the urgency," eliminate targeted jobs through attrition and control of promotions. (*See* Pl.'s Mem. Opp. Mot. Summ. J. Ex. B.)

5. Kirk also argues that Liberty Mutual breached its fiduciary duties by (1) failing to inform Kirk, in response to his specific inquiries, that it was considering implementing an early retirement program as a last resort; and (2) failing to tell him when it decided to consider an early retire-

ment program more seriously. However, such allegations are characteristic of a claim for breach of fiduciary duty and do not support a claim for fraudulent concealment. Furthermore, according to the evidence in the record, Liberty Mutual did not begin to seriously consider an early retirement plan until September, 1991, *after* Kirk had retired. (*See* Cirignano Dep. at 13.) Lastly, the Second Circuit has affirmatively held that an ERISA plan fiduciary does not have to *voluntarily* disclose that it has decided to implement, or was considering implementing, a new early retirement plan. *See Pocchia v. NYNEX Corp.*, 81 F.3d 275, 278–79 (2d Cir.1996).

For these reasons, Kirk has not shown that he is subject to ERISA's six-year statute of limitations for cases of fraud or concealment. Thus, because he brought this action more than "three years after the earliest date on which [he] had actual knowledge of [Liberty Mutual's] breach," 29 U.S.C.A. § 1113 (West Supp.1997), his ERISA claim is time-barred and Liberty Mutual's Motion for Summary Judgment is GRANTED.

## CONCLUSION

For the reasons stated above, Liberty Mutual's Motion for Summary Judgment [doc. # 25] is GRANTED. The Clerk of the Court is ordered to close this case.