Alfred G. GEROSA, Joseph Mitrione, John J. Pylilo, Paul M. Mantia, Angelo Sagnelli, Bert Gallo, and John Pagliuca, Trustees, Cement Masons' Local 780 Pension Fund, Plaintiffs,

v.

Neil J. SAVASTA, Mark Schor, and Savasta and Company, Inc., Defendants.

No. 01 CIV.1761(AKH).

United States District Court, S.D. New York.

March 13, 2002.

## OPINION AND ORDER DENYING MOTION TO DISMISS

HELLERSTEIN, District Judge.

Plaintiffs, the trustees of an employee benefit fund, sue the fund's actuary to recover damages caused by the actuary's negligence. The actuary, in analyzing and reporting on the fund's actual and expected experience, reported that the fund was over-funded and recommended to the trustees that they increase benefits payable to participants and beneficiaries. A year later, the actuary reported that it had erred, that the fund actually had been underfunded, and that the data that it had used to arrive at its erroneous report and recommendation could not be located. The trustees then filed this lawsuit to recover the substantial damage caused to the fund by the actuary's negligence.

I am asked to decide whether the trustees' lawsuit is governed by federal law, cognizable only in a federal district court, or whether it is governed by state law. I hold that the governing law is federal, that the federal district courts have exclusive jurisdiction to hear it, and that plaintiff, with an amendment, is able to state a legally sufficient claim for relief under ERISA.[1]

I am well aware that my opinion does not follow the trend of recent decisions of the United States Supreme Court. I come to my decision because I believe that ERISA requires it, because the fact pattern in the case before me makes it distinguishable from the Supreme Court decisions, and because it conforms to the reasoning of an earlier decision of the Second Circuit Court of Appeals.

### I. The Allegations of the Complaint

Plaintiffs are trustees of a multi-employer, defined benefit pension plan, the Cement Masons Local 780 Pension Fund. As trustees, they engaged defendant, Savasta and Company, Inc., to perform actuarial services for the plan. Defendant, after performing actuarial studies, expressed the opinions that the plan was over-funded, that it had been so for several years, and that the benefits payable to its participants and beneficiaries should therefore be increased. Defendant's written benefit study report found that the plan's vested benefit fund ratio was 128% as of December 31, 1994, 110.8% as of December 31, 1995, and 110% as of December 31, 1996. Defendant's report calculated that the increase in defined benefits that it recommended would leave the fund with a benefit fund ratio which still exceeded 100%.

Plaintiffs accepted the recommendation on December 18, 1997, and increased the defined benefits of the beneficiaries. Defendant's post-action review found that the plan remained with an overfunded ratio of 102.4 %.

In fact, however, the plan was underfunded, and the increase in defined benefits that the trustees put into effect, relying on defendant's report and recommendation, caused the underfunding to be substantially larger. As of the year ended December 31, 1998, defendant determined

---

1. At argument, plaintiffs withdraw their claims against the actuary's principals, Neil J. Savasta and Mark Schor. My accompanying order instructs the clerk to dismiss them and to reform the caption to reflect that Savasta and Company, Inc. will be the only remaining defendant.

that the plan's vested benefit fund ratio was not 102.4%, as it had calculated the year before, but only 71.3 %. Defendant now expressed its actuarial opinion that "the assets of the fund are not sufficient to cover the cost of all vested benefits ... [imposing] a further obligation on the part of the Contributing Employers in the event of a plan termination."

Plaintiffs sued, alleging that defendant was negligent and, as a result, plaintiffs "anticipate the fund will not be able to afford" the pension obligations that will inexorably become due, and that they are "forced to assume significant increases in liabilities that the Pension Fund anticipates that it will not be able to afford." The complaint alleges that defendant has failed to supply the data upon which its actuarial reports relied, claiming that they were lost. Plaintiffs allege that defendant violated its duties as plan actuary, and that the fund of which plaintiffs are fiduciaries suffered damage as a result of defendant's negligence.

Plaintiffs allege three claims to recover from defendant's malpractice: (1) a federal claim under ERISA,[2] and state claims for (2) promissory estoppel, and (3) breach of contract. Defendants move to dismiss plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6), arguing: (1) plaintiffs failed to plead an actual, concrete injury, (2) plaintiffs' ERISA claim is not authorized by the terms of the Act, and (3) that plaintiffs state law contract claims are preempted by ERISA.

With regard to defendant's first argument, Plaintiffs represent that they are able to prove actual, quantifiable damage:

the amount necessary to restore the plan on an actuarial basis to a properly funded basis. I therefore hold that Plaintiffs can satisfy the liberal standards for amending a pleading at the inception of a case, and I grant them leave to amend in this respect. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992).

As thus amended, I hold that plaintiffs' claim for relief under ERISA is legally sufficient and, in consequence, that plaintiffs' second and third claims for relief are preempted and, thus, dismissed.[3]

## II. *The Relevant Statutory Provisions and the Congressional Purpose*

The Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1001 *et seq.*, comprehensively regulates employee benefit plans established by labor and management for the benefit of employees. To accomplish this end, the Act defines the actors and concepts central to the formation and management of benefit plans, sets out the duties and responsibilities of those actors, and provides rights to sue and an exclusive federal forum. The relevant provisions are set out below.

### A. *Fiduciaries, Accountants and Actuaries*

Section 3(21)(A) of ERISA, 29 U.S.C. § 1002(21)(A), defines a "fiduciary of an ERISA plan as a party who:

(i) exercises any discretionary authority or discretionary control respecting management of such plan or exercises any authority or control respecting management or disposition of its assets, (ii) ...

---

**2.** Plaintiffs federal claim seeks restitution. I held at argument that the claim was miscast, and I consider it one for damages. Tr. Arg. at pp. 24–25; *see* n. 4, *infra*. Plaintiffs are directed to amend their complaint accordingly.

**3.** Conversely, if I were to hold that ERISA does not permit plaintiffs' suit as a federal claim, plaintiffs would be able to state a claim under New York law in the New York Supreme Court.

renders investment advice for a fee or other compensation, direct or indirect, with respect to any moneys or other property of such plan ... or (iii) ... has discretionary authority or discretionary responsibility in the administration of such plan."

The instrument that creates an employee benefit plan is required to provide for one or more named fiduciaries who jointly or severally are to have the authority to control and manage the operation and administration of the plan and to employ people to give them advice. ERISA § 402, 29 U.S.C. § 1102. The fiduciaries are to discharge their duties solely in the interest of the participants and beneficiaries, without conflicting transactions, and with the "care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man ... would use ...." *Id.* §§ 404, 406, 29 U.S.C. § 1104, 1006. They may be liable for each other's breaches of fiduciary duty if they know of them and fail to make reasonable efforts to remedy the breach, or if they knowingly participate in, or conceal, the breach. *Id.* § 405, 29 U.S.C. § 1105. Fiduciaries who commit breaches of their duties "shall be personally liable to make good" any losses and to restore "any profits of such fiduciary," and shall be subject to other "equitable or remedial relief." *Id.* § 409, 29 U.S.C. § 1109.

One of ERISA's central purposes was to assure full and proper disclosure with respect to the "establishment, operation, and administration" of employee benefit plans. ERISA § 2, 29 U.S.C. § 1001. To that end, section 103 of ERISA, 29 U.S.C. § 1023, provides detailed requirements governing such disclosures. "Independent qualified public accountants" and "enrolled actuaries" are to be engaged, and annual reports are to be filed containing their statements and opinions. *Id.* §§ 103(a)(3)(A), (a)(4)(A), 29 U.S.C.

§§ 103(a)(3)(A), (a)(4)(A). As to the "enrolled actuary," the opinion to be contained in the Annual Report is to the effect that the matters reported on "are in the aggregate reasonably related to the experience of the plan and to reasonable expectations," and that they "represent his best estimate of anticipated experience under the plan." *Id.* § 103(a)(4)(B), 29 U.S.C. § 1023(a)(4)(B). The annual "statement" of the "enrolled actuary" is to include a "valuation" based on costs, liabilities, benefits, actuarial assumptions and methods used to determine costs, justifications for changes in actuarial assumptions of cost methods, numbers of retired and nonretired participants and beneficiaries, current and present value of accumulated assets and actuarial assumptions of contributions required for "minimum funding standards," ERISA § 302, 29 U.S.C. § 1082, present values of nonforfeitable benefits for participants and beneficiaries and actuarial assumptions and techniques used in determining such values, and the like, including "such other information as may be necessary to fully and fairly disclose the actuarial position of the plan." ERISA § 103(d), 29 U.S.C. § 1023(d).

Thus, section 103(a)(4)(B) provides:

The enrolled actuary shall utilize such assumptions and techniques as are necessary to enable him to form an opinion as to whether the contents of the matters reported under subsection (d) of this section—(i) are in the aggregate reasonably related to the experience of the plan and to reasonable expectations; and (ii) represent his best estimate of anticipated experience under the plan.

And thus, section 103(d) provides that the contents of the "Actuarial Statement" in each benefit plan's annual report shall include:

(3) [t]he normal costs, the accrued liabilities, an identification of benefits not included in the calculation; a statement of the other facts and actuarial assumptions and methods used to determine costs, and a justification for any change in actuarial assumptions or cost methods; and the minimum contribution required.... (5)[t]he present value of the assets of the plan used by the actuary in any computation of the amount of contributions to the plan required ... and a statement explaining the basis of such valuation.... (7)[a] certification of the contribution necessary to reduce the accumulated funding deficiency to zero.... (8)[a] statement by the enrolled actuary—(A) that to the best of his knowledge the report is complete and accurate, and (b) the requirements of § 302(c)(3) (relating to reasonable actuarial assumptions and methods) have been complied with.... [and] (13)[s]uch other information as may be necessary to fully and fairly disclose the actuarial position of the plan.

An actuary is not normally a fiduciary; an actuary can be considered a fiduciary only if he exercises authority or control or discretion over the plan, or renders investment advice concerning plan assets. *See* 29 C.F.R. § 2509.75–5 (1986) ("attorneys, actuaries and consultants performing their usual professional functions will ordinarily not be considered fiduciaries" unless they give investment advice or have discretion over plan management); *F.H. Krear & Co. v. Nineteen Named Trustees*, 810 F.2d 1250, 1259–60 (2d Cir.1987) (plan attorney held not a fiduciary under the regulations where he did not exercise authority or discretion over plan assets or management). Plaintiffs have not alleged that defendant was engaged to perform, or did perform, anything other than actuarial services.

## B. *Provisions Governing Civil Suits Under ERISA*

Section 502 of ERISA, 29 U.S.C. § 1132, authorizes civil actions to enforce the Act and employee benefit plans organized thereunder. Subsection (a) provides specifically who may sue, for what, and against whom. The relevant provisions are as follows:

(a) Persons empowered to bring a civil action.

A civil action may be brought -

(1) by a participant or beneficiary -

(A) for the relief provided for in subsection (c) of this section, or

(B) to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan;

(2) by the Secretary, or by a participant, beneficiary or fiduciary for appropriate relief under section 1109 of this title;

(3) by a participant, beneficiary, or fiduciary (A) to enjoin any act or practice which violates any provision of this subchapter or the terms of the plan, or (B) to obtain other appropriate equitable relief (i) to redress such violations or (ii) to enforce any provisions of this subchapter or the terms of the plan;

Thus, under these provisions, a fiduciary is given the right to sue "for appropriate relief under section 1109" (i.e., for damages and to recover improper gain), and for injunctive and "other appropriate equitable relief" to redress violations or enforce ERISA. *Id.* §§ 502(a)(2), (3), 29 U.S.C. §§ 1139(a)(2), (3).

## C. *Jurisdiction and Preemption*

The United States district courts have "exclusive jurisdiction of civil actions under [ERISA]," without respect to amounts in

controversy or citizenship of parties, whether brought by the Secretary or by a participant, beneficiary, fiduciary, or other enumerated person. ERISA §§ 502(e), (f), 29 U.S.C. §§ 1132(e), (f). Two exceptions are provided: actions for benefits by participants or beneficiaries, and actions by a State for medical child support orders. *Id.* §§ 502(a)(1)(B), (a)(7), 29 U.S.C. §§ 1132(a)(1)(B), (a)(7).

ERISA also supersedes "all State laws insofar as they relate ... to any employee benefits plan" governed by ERISA, with some inapplicable exceptions.

> Except as provided in subsection (b) of this section, the provisions of this subchapter and subchapter III of this chapter shall supersede any and all State law insofar as they may now or hereafter relate to any employee benefit plan described in section 1003(a) of this title and not exempt under section 1003(b) of this title.

ERISA § 514(a), 29 U.S.C. § 1144(a). "State Law" is defined to include "all laws, decisions, rules, regulation, or other State action having the effect of law." *Id.* § 514(c), 29 U.S.C. § 1144(c).

### D. *The Congressional Purpose*

Congress, after lengthy studies, proposed that ERISA should prescribe legislative remedies for the various deficiencies of the preexisting private pension plan systems. S.Rep. No. 93–127, at 1 (1974), *reprinted in* 1974 U.S.C.C.A.N. 4838, 4838, *reprinted in* 1 Subcommittee on Labor and Public Welfare, 94th Cong., 2d Sess., Legislative History of the Employee Retirement Income Security Act of 1974, at 587 (Comm. print 1976) (hereinafter Leg. Hist.). The legislation was intended to impose specified and required standards of vesting, funding, reinsurance, disclosure and fiduciary standards, and to create an Office of Pension and Welfare Administration in the Department of Labor to implement these standards. *Id.* Pensions to employees were a form of remuneration for labor, and a mandatory subject of collective bargaining. *Id.* at 3, *reprinted in* 1 Leg Hist. at 589 (citing *Inland Steel Co. v. NLRB*, 170 F.2d 247 (7th Cir.1948)).

The bill that the Committee developed was proposed as a comprehensive private pension reform program, to enable American workers to look forward to financial security and dignity in their retirement, and to increase economic stability of pension plan assets. The legislation was intended to establish "minimum standards and safeguards for private pensions," that would be "sufficiently adequate and effective to prevent the numerous inequities to workers under plans which have resulted in tragic hardship to so many." *Id.* at 13, *reprinted in* 1 Leg. Hist. at 599. The bill was to represent "an effort to strike an appropriate balance between the interests of employers and labor organizations in maintaining flexibility in the design and operation of their pension programs, and the need of the workers for a level of protection which will adequately protect their rights and just expectations." *Id.* The bill was modeled after the National Labor Relations Act and other labor standards laws. *Id.* at 14, *reprinted in* 1 Leg. Hist. at 600.

The bill proposed by the Senate provided a "uniform source of law in the areas of vesting, funding, insurance and portability standards, for evaluating fiduciary conduct, and for creating a single reporting and disclosure system in lieu of burdensome multiple reports." The standards proposed by Congress were to be enforceable by a "full range of legal and equitable remedies available in both state and federal courts and to remove jurisdictional and procedural obstacles." The measures were intended to eliminate those obstacles,

for in the past they had "hampered effective enforcement of fiduciary responsibilities under state law or recovery of benefits due to participants." *Id.* at 35, *reprinted in* 1 Leg. Hist. at 621.

The Conference Report placed further emphasis on the roles of actuaries in assuring that employers satisfy minimum funding requirements or become subject to a special excise tax, and that any surplus of funding by the employee would receive proper credit. H.R. Conf. Rep. No. 93–1280, at 284, *reprinted in* 1974 U.S.C.C.A.N. 5038, 5065 (1974), *reprinted in* 3 Leg. Hist. at 4551. The Conference Report described how the separate rules provided by the Senate and the House bills were combined by the Conference Committee, to the end that "all plan costs, liabilities, rates of interest, and other factors under the plan are to be determined on the basis of actuarial assumptions and methods which, in the aggregate, are reasonable." *Id.* The Conference Committee stated that the actuarial assumptions, after taking into consideration "the experience of the plan and reasonable expectations," were to offer "the actuary's best estimate of anticipated experience," under "a single set of actuarial assumptions" for all actuarial purposes. *Id.* at 284–85, *reprinted in* 3 Leg. Hist. at 4551–52.

The Conference Committee acknowledged that the bill, although comprehensive, was "not perfect." As Representative Perkins told his colleagues in the House, "On a bill so vastly complicated some consequences are almost certainly unforeseen and some problems will arise, but we will continue vigorous oversight of the act." 120 Cong. Rec. 29192, 29193 (1974), *reprinted in* 3 Leg. Hist. at 4658 (H.R. floor debate on conference report, Aug. 20, 1974).

The Conference Committee also focused on the preemption provisions of the Act.

Except for narrow specified exceptions, "the substantive and enforcement provisions of the conference substitute [were] intended to preempt the field for Federal regulations, thus eliminating the threat of conflicting or inconsistent State and local regulation of employee benefit plans." 120 Cong. Rec. 29928, 29933 (1974), *reprinted in* 3 Leg. Hist. at 4745–46 (Senate floor debate on conference report, Aug. 22, 1974). The Conference Committee emphasized that it intended to apply this principle of preemption "in its broadest sense to all actions of State or local governments, or any instrumentality thereof, which have the force or effect of law." *Id.* The federal interest was to be "comprehensive and pervasive," and "the interests of uniformity with respect to interstate plans required—but for certain exceptions—the displacement of State action in the field of private employee benefit programs." *Id.* at 29942, *reprinted in* 3 Leg. Hist. at 4771. The Conference Committee intended "that a body of Federal substantive law will be developed by the courts to deal with issues involving rights and obligations under private welfare and pension plans." *Id.*

### III. *Discussion*

A district judge may dismiss a complaint challenged by a Rule 12(b)(6) motion, Fed. R.Civ.P. 12(b)(6), only when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim that would entitle him to relief." *D'Alessio v. New York Stock Exchange, Inc.*, 258 F.3d 93, 99 (2d Cir.2001). All material allegations of the complaint are to be accepted as true, and all reasonable inferences are to be drawn in favor of the nonmoving party. *Id.* However, the court need not accept allegations which are contradicted by documents referenced in the complaint. *See DeJesus–Keolamphu v. Village of Pelham Manor,* 999 F.Supp. 556, 563

(S.D.N.Y.1998). And a district judge is not required to accept a complaint as styled when, fairly read, the facts alleged give rise to a different claim for relief.

## A. *ERISA as a Comprehensive and Reticulated Statute*

█ The United States Supreme Court regards ERISA as a "comprehensive and reticulated statute, the product of a decade of congressional study of the Nation's private employee benefit system." *Mertens v. Hewitt Assocs.,* 508 U.S. 248, 251, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (Scalia, J.). Citing its earlier decision, *Massachusetts Mut. Life. Ins. Co. v. Russell,* 473 U.S. 134, 146–47, 105 S.Ct. 3085, 87 L.Ed.2d 96 (1985), the Supreme Court "emphasized" its "unwillingness to infer causes of action in the ERISA context," and ruled that the "carefully crafted and detailed enforcement scheme" provided by the statute was " 'strong evidence that Congress did *not* intend to authorize other remedies that it simply forgot to incorporate expressly.' " *Mertens,* 508 U.S. at 254, 113 S.Ct. 2063 (quoting *Russell,* 473 U.S. at 146–47, 105 S.Ct. 3085.)

In *Mertens,* a class of beneficiaries under an ERISA plan sued the fiduciaries of the plan for allowing the plan to be stripped of assets, and the actuaries for knowingly participating in and aiding and abetting the fiduciaries' wrongs. Kaiser Steel Corp., the sponsor of the plan, had encouraged early retirement of employees in a steel plant that was soon to be shut down. However, the trustees, helped by the actuaries, did not adjust the plan's actuarial assumptions to account for the consequences: earlier payment of benefits, reduced levels of contributions, loss of investment income, and short term increases in expenses. In consequence, the plan became underfunded and unable to satisfy benefit obligations. The Pension Benefit Guarantee Corporation terminated the plan, and reduced pensions to the stipulated minima guaranteed by ERISA. The beneficiaries, as a class, sued to recover their loss.

The district court dismissed the complaint against the actuaries, and the Court of Appeals for the Ninth Circuit affirmed in relevant part. The Supreme Court granted certiorari on the question whether ERISA authorizes suits for money damages against nonfiduciaries who knowingly participate in a fiduciary's breach of fiduciary duty.

The Supreme Court held that the actuaries were not acting as fiduciaries and could not be sued as such, that ERISA did not authorize beneficiaries to sue non-fiduciaries for money damages, and that styling the action as an action for equitable relief did not change its character as an action at law. The Supreme Court ruled that professional service providers to ERISA plans, such as actuaries, would become liable for damages only "when they cross the line from advisor to fiduciary." The intent of the statute, the Supreme Court held, was to limit liability for money damages to "persons who had ⋮ ... real power to control what the plan did." *Id.* at 262, 113 S.Ct. 2063. There was tension between ERISA's twin goals of benefitting employees and containing pension costs, and Congress wished not to "impose high insurance costs upon persons who regularly deal with and offer advice to ERISA plans, and hence upon ERISA plans themselves." *Id.*

The beneficiaries argued that the common law of trusts recognized the right of beneficiaries to sue non-fiduciaries who knowingly participate in the wrongs of fiduciaries, that such actions would now be preempted by ERISA, and that ERISA should not be interpreted to give beneficiaries *less* protection than existed before

ERISA. *Id.* at 261, 113 S.Ct. 2063. The Supreme Court nevertheless held for dismissal, reasoning that ERISA was "an enormously complex and detailed statute that resolved innumerable disputes between powerful competing interests—not all in favor of potential plaintiffs." *Id.* The Supreme Court noted that it was not deciding whether or not "previously available state-court actions" were preempted by ERISA. *Id.*

Before *Mertens*, the Second Circuit Court of Appeals expressed a somewhat different view of the law. In *Diduck v. Kaszycki & Sons Contractors, Inc.*, 974 F.2d 270, 281 (2d Cir.1992), the shop steward of a union, who was also a trustee of two ERISA Funds, failed to obtain contributions payable by the employer for employees who, as off-the-book immigrants, were not members of the union. The participants and beneficiaries of the ERISA Funds brought suit, alleging fraud on the part of the shop steward, in dereliction of his duties as a trustee and ERISA fiduciary. Plaintiffs alleged also that the employer knew of the fraud, and participated in it and benefitted from it, giving rise to joint and several liability with the fiduciary.

The Court of Appeals held for the plaintiffs, against the shop steward and trustee for his breach of fiduciary duty and, jointly and severally, against the employer for knowingly participating in the ERISA fiduciary's breach of duty.

The Court of Appeals recognized that under the "plain terms" of the statute, ERISA actions to recover damages for breach of fiduciary duty "lie only against the fiduciary who breaches such a duty" and co-fiduciaries who knowingly participate in or conceal the breach. *Id.* at 279–280; *see* ERISA, §§ 405, 409, 502(a)(2), 29 U.S.C. §§ 1105, 1109, 1132(a)(2). The Court of Appeals recognized also that "ERISA is a comprehensive and reticulat-

ed statute," and that "a court should be wary of reading into it remedies in addition to those expressly set forth." *Diduck,* 974 F.2d at 279 (citing *Russell,* 473 U.S. at 146–148, 105 S.Ct. 3085). However, the Court of Appeals ruled, "Congress wanted federal courts to fill any gaps in the statute by looking to traditional trust law principles," and "a federal common law right of action should be recognized" if "consistent with ERISA's scheme and [to] further its purposes." *Id.* at 280.

The Court of Appeals considered that the broad preemption provisions of ERISA strongly supported its approach. Under section 514(a) of ERISA, 29 U.S.C. § 1144(a), ERISA is to "supersede any and all State laws insofar as they may now or hereafter relate to any [ERISA] employee benefit plan." If the courts were to hold that suits might not lie under ERISA against non-fiduciaries, yet consider such suits preempted by the broad supersession language of section 514(a), the result would be anomalous, for then there would be no action at all to recover for wrongs caused by non-fiduciaries. "Congress could not have aimed to preempt such actions" if it did not authorize them, "by judicial interpretation if not by explicit provision." *See Diduck,* 974 F.2d at 280–81. "Congress' scheme of bringing uniformity to the area of employee benefit plans would be undermined insofar as the conduct and liability of non-fiduciaries would be assessed by varying state laws, while the conduct and liability of the fiduciary ... would be governed by federal law." *Id.* at 281. Accordingly, the Court of Appeals held that recognizing an action against non-fiduciaries for aiding and abetting a breach of fiduciary duty furthered the goals of ERISA to establish a uniform federal standard for non-fiduciary liability and to protect employees benefit plans. *Id.; see also DeLaurentis v. Job Shop Tech. Servs.,*

*Inc.*, 912 F.Supp. 57 (E.D.N.Y.1996) (following *Diduck* even after *Mertens* ).

■ *Mertens,* however, not *Diduck,* is the controlling authority on aiding and abetting liability and, under *Mertens,* an actuary who knowingly participates in a fiduciary's breach of duty may not be sued along with the fiduciary. As *Mertens* held, section 502 of ERISA, 29 U.S.C. § 1132, does not provide explicitly for suits by fiduciaries against non-fiduciaries to recover damages. And "equitable relief," the Supreme Court has held more recently, that is, the right given to fiduciaries by section 502 to sue both fiduciaries and non-fiduciaries "to enjoin any act or practice" which violates the Act or the terms of an ERISA plan, or to obtain "other appropriate equitable relief to redress such violation," or "to enforce any provision" of ERISA, *see* ERISA § 502(a)(3), 29 U.S.C. § 1132(a)(3), is not an elastic term, but is to be construed according to its narrow and technical meaning. *See Great–West Life & Ann. Ins. Co. v. Knudson,* 534 U.S. 204, ——, 122 S.Ct. 708, 712–16, 151 L.Ed.2d 635 (2002) (an employee benefit plan may not sue to be subrogated to a beneficiary's insurance recovery or to be reimbursed by the beneficiary for benefits paid and recovered twice by the beneficiary, since ERISA does not provide explicitly that a fiduciary can sue a participant or beneficiary to recover damages, such a right of action may not be judicially incorporated, and a claim for reimbursement and subrogation is not a traditional claim for "other appropriate equitable relief to redress [a] violation [of ERISA]").

The actuary in the case before me is not a fiduciary, and the action before me is for damages and not to enjoin a violative act or practice or obtain equitable relief.[4] The actuary is being sued, not for aiding and abetting a fiduciary as was the case in *Mertens,* but for the actuary's own wrong, for failing properly to perform the obligations directly and extensively imposed by ERISA on actuaries. Should *Mertens* be read as foreclosing such a suit under ERISA? Do the trustees have to bring their lawsuit in the New York Supreme Court, under New York law, notwithstanding that ERISA, not state law, provides the measure, scope and definition of actuarial duties for employee benefit plans? Do the broad preemption provisions of ERISA supersede state law and create a legislative/judicial vacuum that defines a duty but allows no right to recover damages caused by a breach of that duty? Before seeking to answer these intriguing and crucial questions, I turn to a discussion of ERISA's provisions with respect to preemption and exclusive federal jurisdiction.

### B. *Preemption*

■ ERISA's preemption provision is broad, and has been interpreted broadly. *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, 138, 111 S.Ct. 478, 112 L.Ed.2d 474 (1990). *Ingersoll–Rand* involved a case of wrongful termination of an employee whose pension rights had vested. The employee alleged that the company's reduction in force, as applied to him, was motivated to avoid further pension contributions and payments of pension benefits. He sued, however, to recover only lost

---

4. Although plaintiffs styled their claim as equitable, seeking restitution, their suit, as I ruled at argument, was at law, seeking compensatory damages caused by defendant's negligence. *See* n. 1, *supra; Geller v. County Line Auto Sales,* 86 F.3d 18, 22 (2d Cir.1996)

("to receive restitution, a plaintiff must demonstrate that the defendant 'had wrongfully secured a benefit, or had passively received one which it would be unconscionable to retain' ").

wages and punitive damages, not lost pension benefits, and argued that his suit had no relation to ERISA and was properly before the Texas state courts. The Texas Supreme Court agreed, but the United States Supreme Court reversed. Justice O'Connor, writing for a unanimous court, held that the broad preemption provision of section 514(a), 29 U.S.C. § 1144(a), applied, and that the employee's suit, even though not styled to invoke ERISA and even though not seeking an ERISA recovery, was nevertheless to be considered as " 'relate[d] to' " an "ERISA-covered plan." *Id.* at 140, 111 S.Ct. 478.

> The preemption clause is conspicuous for its breadth. Its deliberately expansive language was designed to establish pension plan regulation as exclusively a federal concern. The key to § 514(a) is found in the words "relate to." Congress used those words in their broad sense, rejecting more limited pre-emption language that would have made the clause applicable only to state laws relating to the specific subjects covered by ERISA. Moreover, to underscore its intent that § 514(a) be expansively applied, Congress used equally broad language in defining the "State law" that would be preempted. Such laws include "all laws, decisions, rules, regulations, or other State action having the effect of law."

*Id.* at 138–39, 111 S.Ct. 478 (citations omitted). "Even if a state law "is not specifically designed to affect such plans, or the effect is only indirect," the United States Supreme Court ruled, preemption applies." *Id.* at 139, 111 S.Ct. 478. The Court reasoned that since the existence of a pension plan was a "critical factor in establishing liability under the State's wrongful discharge law," the lawsuit " 'relate[d] to' an ERISA-covered plan" and was therefore preempted.[5]

*Shaw v. Delta Air Lines, Inc.*, 463 U.S. 85, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983), also illustrates the breadth of ERISA's preemption clause. The case involved New York's Human Rights law, a comprehensive anti-discrimination statute. The state law included a feature that provided that pregnancy had to be treated equivalent to other disabilities, and made it a violation of state law to discriminate against pregnant employees. The airlines sued to invalidate the provision as it affected employee benefits, arguing that it "related to" their employment benefit plans, and was therefore preempted. The Supreme Court agreed, holding that section 514(a) required preemption, not only where there was conflict between the state law and a provision of ERISA, but also, even in the absence of such a conflict, if there was a relationship between the state law and an employee benefit plan.[6] The

---

**5.** Plaintiff argued that he should be allowed to maintain his state court lawsuit because ERISA did not apply to his precise fact situation. However, the United States Supreme Court noted, section 510 of ERISA, 29 U.S.C. § 1140, made it unlawful to interfere with an employee's attainment of pension rights, thus suggesting that the state court lawsuit either had to conform to section 510 and be cognizable in federal court, or be barred. In either event, preemption had to apply, for the civil enforcement mechanism of ERISA, section 502(a), 29 U.S.C. 1132(a), providing certain remedies and not providing others, would be "completely undermined if ERISA-plan par-

ticipants and beneficiaries were free to obtain remedies under state law that Congress rejected in ERISA." *Id.* at 142–43.

**6.** The provisions of New York's law forbidding discrimination against pregnant employees were inconsistent at the time with federal civil rights laws. Insofar as other provisions of New York law were consistent with federal civil rights laws, the Supreme Court held that those provisions were not preempted, since Congress intended that federal and state civil rights laws should work in complementary fashion. Furthermore, ERISA § 514(d), 29 U.S.C. § 1144(d), provided that ERISA does

Supreme Court came to its holding by both a literal reading of the breadth of section 514(a), and through consideration of Congressional history.

> The bill that became ERISA originally contained a limited preemption clause, applicable only to state laws relating to the specific subjects covered by ERISA. The Conference Committee rejected these provisions in favor of the present language, and indicated that the section's preemptive scope was as broad as its language.

*Id.* at 98, 103 S.Ct. 2890. And, further:

> The emergence of a comprehensive and pervasive Federal interest and the interests of uniformity with respect to interstate plans required—but for certain exceptions—the displacement of State action in the fields of private employee benefit programs.

*Id.* at 99, n. 20, 103 S.Ct. 2890 (quoting remarks of Sen. Javits).

■ The breadth of preemption, however, had limits. "Some state actions," the Supreme Court noted, "may affect employee benefit plans in too tenuous, remote, or peripheral a manner to warrant a finding that the law 'relates to' the plan." *Id.* at 100, n. 21, 103 S.Ct. 2890. *Shaw* and *Ingersoll–Rand* illustrated what might be considered "too tenuous, remote, or peripheral" to an employee benefit plan: suits to garnish benefits to participants as, for example in marital contests, *Id.;* suits for lump-sum severance upon plant closures— in general, "state laws that [do not] relate to benefit plans," *Ingersoll–Rand,* 498 U.S. at 139, 111 S.Ct. 478. As the Second Circuit put it, in a case involving whether Connecticut's escheat laws could cover un-

claimed employee-benefits, if a state statute of general application "does not affect the structure, the administration, or the type of benefits provided by an ERISA plan, the mere fact that the statute has some economic impact on the plan does not require that the statute be invalidated." *Aetna Life Ins. Co. v. Borges,* 869 F.2d 142, 145–46 (2d Cir.1989) (rule of preemption "does not require the creation of a fully insulated legal world that excludes ... from regulation ... any purely local transaction").

The services of professionals, it would seem, significantly affect "the structure, the administration, [and] the type of benefits provided by an ERISA plan," to quote the rule of *Aetna Life.* The fiduciaries of an ERISA plan must necessarily rely on the opinions of actuaries to determine what levels of benefits can be provided to participants and beneficiaries. The fiduciaries must necessarily rely on auditors and accountants to assure the financial integrity of the assets and earnings of the ERISA plan over which they have stewardship. And the fiduciaries must necessarily rely on lawyers to assure that the ERISA plan is properly organized and operates in conformity to the complex statutory, regulatory and caselaw framework. Not surprisingly, ERISA requires that actuaries and auditors be engaged to analyze, audit and report on the employee benefit plans, and provides the detailed framework within which they are required to operate and deliver their professional opinions. ERISA § 103, 29 U.S.C. § 1023 (quoted in substantial part earlier in this opinion).

---

not "alter, amend, modify, invalidate, impair, or supersede any law of the United States," and the anti-discrimination laws of the United States were intended to work in complementary fashion with similar state laws. Thus,

even though such harmonious provisions of state law "related to" the airlines' employee-benefit plans within the meaning of section 514(a), they were not preempted because of the provisions of section 514(d).

One would therefore think that the negligence or misfeasance of an actuary, auditor, or attorney would "relate to" an employee benefit plan in a significant way, that state law would be preempted, that the provisions referred to above would "supersede" state law, and that the district courts would be the exclusive forum to hear such suits. ERISA, §§ 502(e), (f), 514(a), 29 U.S.C. §§ 1132(e), (f), 1144(a). Surprisingly, however, many cases draw the opposite conclusion, presumably in response to the rulings of the Supreme Court in *Russell* and *Mertens*. *See, e.g., Airparts Co., Inc. v. Custom Benefit Servs. of Austin, Inc.*, 28 F.3d 1062, 1065 (10th Cir.1994) (state law negligence and fraud claims against plan actuary, held, not preempted); *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse*, 879 F.2d 1146, 1153 (3d Cir.1989) (state law malpractice claim against plan accountants, held, not preempted); *Board of Trustees, Teamsters Local 918 Pension Fund v. Freeburg & Freeburg*, 98 Civ. 4895(SJ), 1999 WL 803895, at *4 (E.D.N.Y. Sept. 28, 1999) (state law malpractice claims against nonfiduciary plan accountants, held, not preempted); *Liss v. Smith*, 991 F.Supp. 278, 308 (S.D.N.Y.1998) (state law legal malpractice claim, held, not preempted); *Carpenters' Local Union No. 964 Pension Fund v. Silverman*, No. 93 Civ. 8787(RPP), 1995 WL 378539, at *5 (S.D.N.Y. June 26, 1995) (state law malpractice and breach of contract claims against plan lawyers, held, not preempted); *Isaacs v. Group Health, Inc.*, 668 F.Supp. 306, 313 (S.D.N.Y.1987) (breach of contract and negligence claim against plan actuary, held, not preempted); *Pedre Co., Inc. v. Robins*, 901 F.Supp. 660, 666 (S.D.N.Y. 1995) (state law claims for malpractice, fraud, breach of contract and conspiracy against plan accountants, held, not preempted).

The rationale of the Third Circuit, expressed in *Painters of Philadelphia Dist. Council No. 21 Welfare Fund v. Price Waterhouse, supra*, is instructive. Relying on *Russell*, and anticipating the holding of the United Supreme Court in *Mertens*, the Court of Appeals held that Congress intended not to give fiduciaries a right of action against non-fiduciaries for damages, for otherwise such a right would have been part of the "six carefully integrated civil enforcement provisions found in § 502(a)." *Painters*, 879 F.2d at 1152 (quoting *Russell*, 473 U.S. at 147, 105 S.Ct. 3085). Were there not such a strong indication of Congressional intent, the Court of Appeals observed, the implication of a cause of action into the statute, in favor of fiduciaries and against non-fiduciary professionals for damages caused by their professional malpractice, would have been favored as "consistent with the statutory purpose of requiring an audit in accordance with specified standards" "for the benefit of the beneficiaries of employee benefit plans as represented by their trustees." *Id.* at 1152. The absence of recourse in the federal courts led the Court of Appeals to find recourse in the state courts, under state law.

> Moreover, state law has traditionally prescribed the standards of professional liability and, in the absence of clear indicia in the act or legislative history, we are reluctant to ascribe to Congress an intention to intrude in this area. Far from there being clear indicia of an intent to create an implied professional malpractice cause of action under ERISA, there is not a scintilla of evidence that Congress had this in its mind.

*Id.* at 1152–53. The Court of Appeals likened suits against professionals to "run-of-the-mill state law claims such as unpaid

rent, failure to pay creditors, or even torts committed by an ERISA plan ... not preempted by ERISA § 514(a)." *Id.* at 1153, n. 7.

Thus, the reasoning of the Second Circuit in *Diduck* has been forgotten—that a federal action against a non-fiduciary for money damages was necessary to further the Congressional purposes of ensuring that plan beneficiaries were protected from nonfiduciaries' breaches of ERISA's mandates by uniform federal standards and exclusive federal jurisdiction. *Diduck,* 974 F.2d, at 280–81. *Mertens* and, more recently, *Great–West Life,* and their five-to-four majorities have displaced the sounder analysis of *Diduck.*

## C. *Evaluation*

The case before me presents a fact pattern different from both *Mertens* and *Diduck.* The trustees, not the participants and beneficiaries, brought this suit against the actuary, seeking to recover damages caused to the employee benefit plan, not because the actuary aided wrongdoing fiduciaries, but because of the actuary's own negligent malpractice with respect to key ERISA activities required of actuaries: analyzing the actual experience of an employee benefit plan—the status of employer and employee contributions, costs, liabilities, number of participants and covered beneficiaries, current and present values of plan assets, present values of accrued and nonforfeitable benefits, the actuarial assumptions used to calculate all these variables and, upon all of this, the actuary's statement "that to the best of his knowledge the report is complete and accurate," that, "in combination, [it] offer[s] the actuary's best estimate of anticipated experience under the plan," that it discloses "any event which the actuary has not taken into account, and any trend which, for purposes of the actuarial assumptions used, was not assumed to con-

tinue in the future," and that it contains "such other information regarding the plan as the Secretary [of Labor] may by regulation require," and "as may be necessary to fully and fairly disclose the actuarial position of the plan." ERISA §§ 103(d), 302(c), 29 U.S.C. §§ 1023(d), 1082(c).

*Mertens* was focused on a particular category of defendant when it ruled that the right-to-sue provisions of ERISA should be read narrowly and according to its explicit terms: "third persons who knowingly participated in the trustee's breach." *Mertens,* 508 U.S. at 256, 113 S.Ct. 2063. Fiduciaries who had the power "to control and prevent the misdeeds" were exposed by ERISA to suits for damages, the Supreme Court held, not those who knowingly participated with them. *Id.* at 262, 113 S.Ct. 2063. As the Supreme Court stated:

> All that ERISA has eliminated ... is the common law's joint and several liability, for *all* direct and consequential damages suffered by the plan, on the part of persons who had no real power to control what the plan did.

*Id.* The Supreme Court expressed its concern that an exposure of non-fiduciaries to joint and several liability as accessories "would impose high insurance costs upon persons who regularly deal with and offer advice to ERISA plans, and hence upon ERISA plans themselves." *Id.*

In the case before me, the trustees are not guilty of wrongdoing and are not defendants. The trustees properly relied on the actuary whom they had engaged to provide the extensive and fundamental analyses and opinions required by ERISA, under standards provided by ERISA, and conforming to regulations promulgated by the Secretary of Labor under ERISA. Only the trustees have a potential claim against the actuary whom they engaged; it

is a claim defined and bound up with standards created by federal law, and it is this type of claim that I am asked to adjudicate.

ERISA spells out the responsibilities of actuaries. ERISA § 103, 29 U.S.C. § 1023. The level of detail reflects the fundamental importance of their roles to the efficient and effective administration of a pension plan, for it is their analyses of levels of contributions, investment returns, administrative costs, and anticipated obligations to beneficiaries that enable the trustees to operate and administer an employee benefit plan according to expectations set out in a collective bargaining agreement, and to pay the level of defined benefits expected by, and promised to, retiring employees. ERISA's central purpose was to protect the interests of participants and their beneficiaries, by establishing uniform and national standards of responsibility and obligation, and providing ready access to the federal courts to resolve conflicts and disputes in the interpretation and application of ERISA's terms. *See id.* § 2(b), 29 U.S.C. § 1001(b). If 50 different states could define the standards to govern actuaries, a shambles would result. How would negligence be defined? Would punitive damages, or excessive awards for emotional damages, be assessable? Would standards differ from state to state, and affect multi-employer, multi-state employee benefit plans by multiple, confusing standards? If fiduciaries are sued by participants and beneficiaries under federal law (for federal standards would clearly govern), and defend on their allegedly reasonable reliance on an actuary's statement, would their defense be governed by federal law, or by state laws, and would the standards governing the fiduciary's defense differ from the standards governing the fiduciary's liability? Merely to state these questions makes it clear that a fiduciary's lawsuit against a negligent actuary must be governed by federal law. The same federal law that defines what an actuary must do must also define the standards that distinguish between reasonable and negligent conduct.

Responsible actuaries, like other professionals, traditionally carry insurance protection against their errors and omissions, and against potential claims of negligence. It is not likely that insurance rates would vary materially, between actuaries carrying on a general insurance, underwriting and advisory practice, and those engaged by trustees of ERISA employee benefit plans. The Supreme Court's concern, expressed in *Mertens,* about the undue burden of insurance costs, might possibly apply to exposures for aiding and abetting liability;[7] the concern does not appear to be realistic in relation to a theoretical differential between general rates of actuaries' insurance premiums, and any speculative additional charge they supposedly might incur for their ERISA engagements. Nothing in *Mertens,* and nothing in the record before me, suggests that there might be such an additional charge.

The Supreme Court characterizes ERISA as a "comprehensive and reticulated" statute. *See Great–West Life,* 122 S.Ct. at 712 (quoting *Mertens* and *Russell* ). But it cannot be a disembodied statute. The Congressional framers recognized that their bill was "not perfect," and that "on a bill so vastly complicated

---

7. See *Central Bank of Denver v. First Interstate Bank of Denver,* 511 U.S. 164, 114 S.Ct. 1439, 128 L.Ed.2d 119 (1994) (citing high defense costs, uncertainty of standards of behavior, and vexatiousness of litigation as reasons why aiding and abetting liability should be eliminated in securities "10b" litigation).

some consequences are almost certainly unforeseen." 120 Cong. Rec. 29192, 29193 (1974), *reprinted in* 3 Leg. Hist. at 4658 (H.R. floor debate on conference report, H.R.Rep. No. 93-1280, Aug. 20, 1974). Congress' intent to preempt the field and to provide uniform "substantive and enforcement provisions" that would "eliminat[e] the threat of conflicting or inconsistent State and local regulation of employee benefit plans" was clearly stated. 120 Cong. Rec. 29928, 29933 (1974), *reprinted in* 3 Leg. Hist. at 4658 (Senate floor debate on conference report, Aug. 20, 1974). The Congressional framers intended "that a body of Federal substantive law will be developed by the courts" to deal with the gaps, interstices and inevitable imperfections that a bill so comprehensive and detailed must surely develop. *Id.* at 29942, *reprinted in* 3 Leg. Hist. at 4771.

The preemption and exclusive federal jurisdiction provisions of ERISA were modeled on section 301 of the Labor Management Relations Act, 29 U.S.C. § 185; *see Textile Workers v. Lincoln Mills,* 353 U.S. 448, 451, 457, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957). That section, and the Supreme Court's willingness to develop a federal common law thereunder, has created a fair, efficient and comprehensive statutory regime. *See, e.g., Russell,* 473 U.S. at 156, 105 S.Ct. 3085 (Brennan, J., concurring in the judgment). The Second Circuit in *Diduck* recognized the fitness of that model, and applied it to ERISA. *Diduck, supra,* at 280.

Congress passed ERISA to remedy decades of abuse of employee benefit plans. The provisions for full and fair disclosure, to be implemented by annual reports of actuaries and accountants conforming to detailed statutory standards set out in section 103 of ERISA, 29 U.S.C. § 1023, reflect a fundamental Congressional concern. *See* ERISA § 2, 29 U.S.C. § 1001; H.R.

Conf. Rep. No. 93-1280, at 284, *reprinted in* 1974 U.S.C.C.A.N. 5038, 5065 (1974), *reprinted in* 3 Leg. Hist. at 4551. These provisions, no different than others, were to be part of the "comprehensive and pervasive" federal scheme that Congress intended should "displace[] . . . State action in the field of private employee benefit programs," and be governed by a uniform, federal law. 120 Cong. Rec. 29928, 29942 (1974), *reprinted in* 3 Leg. Hist. at 4771. The exclusive federal forum that Congress provided for ERISA litigation is the natural and exclusive forum that should hear and determine the lawsuits of trustees against the actuaries they engaged, for damages caused by those actuaries when they have failed to conform their conduct to the standards provided by ERISA.

## IV.  *Conclusion*

█   For the reasons stated in this Opinion, defendant's motion is denied as to plaintiff's first claim for relief, alleging a claim under ERISA, and plaintiffs are given leave to amend their claim in the respects noted earlier in this Opinion. Since I have sustained the legal sufficiency of plaintiffs' claim for relief under ERISA, I hold that plaintiffs' second and third claims for relief, stating claims under New York State law, are preempted by federal law and are therefore dismissed.

I find that the circumstances for an interlocutory appeal are satisfied. Pursuant to 28 U.S.C. § 1292(b), I find that the issues of federal jurisdiction under ERISA, and the interplay between the federal claim and the state claims, present controlling questions of law as to which there is substantial ground for difference of opinion, and that an immediate appeal may materially advance the ultimate termination of the litigation. Because this litigation will inevitably proceed, either in this court as I have ordered or in the New

York Supreme Court if my rulings are reversed, there will be no stay. The parties, by their respective counsel, will appear for their Initial Case Management Conference on April 12, 2002, at 10:30 a.m.

SO ORDERED.